730 A.2d 396 (1999)
322 N.J. Super. 56
Theodore BLYTHER Plaintiff-Appellant,
v.
NEW JERSEY DEPARTMENT OF CORRECTIONS, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted May 26, 1999.
Decided June 10, 1999.
*397 Theodore Blyther plaintiff-appellant submitted a pro se brief.
Paul H. Zoubek, Acting Attorney General, for defendant-respondent (Joseph L. Yannotti, Assistant Attorney General, of counsel; Gregory A. Spellmeyer, Deputy Attorney General, on the brief).
Before Judges BAIME, CONLEY and A.A. RODRIGUEZ.
The opinion of the court was delivered by BAIME, P.J.A.D.
In response to escalating gang violence in New Jersey's prisons, the Department of Corrections (DOC) created the Security Threat Group Management Unit (STGMU). The STGMU is a non-punitive, three-phase program designed to identify, place and rehabilitate inmates deemed to be core members of certain designated gangs. The goal of the program is to gradually return the rehabilitated inmates to the regular prison population. Thomas Blyther, an inmate at Northern State Prison, challenges his assignment to the STGMU. The principal question presented is whether an inmate has a liberty interest in being assigned to the general prison population subject to due process protection. We hold that assignment to the STGMU does not require the procedural safeguards applicable to disciplinary hearings.

I.
On February 27, 1998, the Commissioner of the DOC issued a policy statement concerning the management of members of gangs historically prone to violence. Among other things, the Commissioner created the STGMU. The STGMU provides a closely monitored structured environment designed to rehabilitate core members of violent gangs. Inmates placed in the STGMU undergo a behavior modification and education program in which they are taught anger management, conflict resolution, and social interactive skills that feature alternatives to violence. The program consists of three phases ultimately *398 leading to the inmates' return to the general prison population. The inmates' progress is periodically reviewed by a hearing committee. Although the STGMU is housed in the Northern State Prison and participating inmates are separated from members of the designated gangs, privileges applicable to the general prison population are granted and the amount of custodial time to be served is not affected. For example, "good time" credits are awarded on the same basis as is applicable to members of the general prison population.
The policy statement established an analytical framework for the identification of gang members. Two or more of the following criteria must be met:
A. Self admission
B. Security Threat Group tattoos
C. Possession of Security Threat Group paraphernalia
D. Information from an outside agency
E. Information from an Internal Affairs report/investigation
F. Correspondence from other inmates or outside contacts
G. Security Threat Group photographs
H. Any other factors which suggest that the inmate is involved in Security Threat Group activities or is a member of a Security Threat Group
Only the leaders of violent gangs must participate in the program. They are identified as "core members." One or more of the following criteria must be satisfied to establish that a gang member is a core member:
1. The inmate has a documented status as a recognized Security Threat Group leader;
2. The inmate has taken a documented part/role in an activity, behavior or involvement in an event/incident associated with a Security Threat Group;
3. The inmate's documented activities, behavior or involvement in an event/incident whether associated with a Security Threat Group or not, poses a threat to the safety of staff, other inmates, or the community; causes damage[ ] to, or destruction of property; cause[s] the interruption of the safe, secure and orderly operation of the correctional facilities;
4. The inmate has been identified as a Security Threat Group Member and has been found guilty of a prohibited act which is an asterisk offense in accordance with N.J.A.C. 10:A-4 "Inmate Discipline" whether or not this offense was related to a Security Threat Group's activities or not.
Under the policy statement, inmates may be transferred to the STGMU upon a finding that there is a reasonable suspicion they are core members. Hearings are conducted within fifteen days of the inmates' notification. Inmates may appear at the hearing unless it is determined that they pose a threat to others or the security of the institution. If the inmate is not permitted to appear, he may have representation present at the hearing on his behalf. They have the right to present evidence and to confront the evidence against them. If the hearing committee considers information that it determines may not be provided, a written summary excluding confidential matters is permitted. The hearing committee issues written findings and conclusions which may be appealed to the prison administrator.
On August 14, 1998, the DOC adopted regulations under the Administrative Procedure Act (APA) (N.J.S.A. 52:14B-1 to -15) essentially mirroring the rules set forth in the Commissioner's policy statement. Five months before promulgation of the regulations, on March 4, 1998, Blyther was transferred to the STGMU and was placed on "prehearing status." On March 6, 1998, Blyther received notice that he had been identified as a member of the "Five Percent Nation," a group the Commissioner had designated as a security *399 threat.[1] A hearing was conducted on March 10, 1998. The evidence against Blyther consisted of an intake admission form in which he had allegedly "checked" a box indicating that he was a member of the Five Percent Nation, and a drawing that contained a gang emblem which had been discovered in his cell. Additionally, in order to establish that Blyther was a core member, the internal affairs unit pointed to his prior disciplinary adjudication of having committed an "asterisk offense" of engaging in an improper group demonstration. In his defense, Blyther claimed that he had marked the box on the intake form indicating that he was a member of the Nation of Islam, and that the document had been altered. He further asserted that the inscription contained on his drawing was not a symbol of the Five Percent Nation. Blyther did not deny that he had previously been found guilty of having committed an asterisk offense.
The hearing committee adjourned the proceedings to investigate Blyther's claim that the intake form had been altered. Senior Investigator John Moore filed a report indicating that Blyther had in fact identified himself as a member of the Nation of Islam. However, the day after he signed the intake form, Blyther had admitted that he was a member of the Five Percent Nation and that he had checked the box marked "Nation of Islam" because he knew the DOC discouraged membership in the Five Percent Nation. Based on this evidence, the hearing committee found that Blyther was a core member of the Five Percent Nation.
Blyther's appeal to the prison administrator was unsuccessful. He contends here: (1) the hearing committee's factual findings were not supported by the evidence, (2) he was denied procedural due process because his alleged membership in the Five Percent Nation preceded the Commissioner's designation of that group as a security threat and because he was not present on the adjourned hearing date when Investigator Moore's report was submitted, and (3) the policy statement constituted administrative rule making in violation of the APA. We reject these arguments.
Blyther's attack upon the hearing committee's factual findings and his claim that the policy statement violated the APA do not require extended discussion. We are satisfied that the findings made could reasonably have been reached on sufficient credible evidence present in the record. Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 92-93, 312 A.2d 497 (1973); Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965); cf. State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964). It cannot fairly be said that the committee went so wide of the mark that a mistake must have been made.
We are nevertheless obliged to add that the agency's articulation of its findings only marginally passes muster. Fact-finding is a basic requirement imposed on agencies that act in a quasi-judicial capacity. In re Issuance of a Permit, 120 N.J. 164, 171, 576 A.2d 784 (1990). This requirement is far from a technicality. New Jersey Bell Tel. Co. v. Communications Workers of Am., 5 N.J. 354, 375, 75 A.2d 721 (1950). No matter how great a deference we must accord the administrative determination, we have no capacity to review the issues at all "unless there is some kind of reasonable factual record developed by the administrative agency and the agency has stated its reasons" with particularity. In re Issuance of a Permit, 120 N.J. at 173, 576 A.2d 784 (quoting State v. Atley, 157 N.J.Super. 157, 163, 384 A.2d 851 (App.Div.1978)).
We agree with Blyther's assertion that the policy statement was tantamount to an agency rule and was adopted *400 in violation of the APA. See N.J.S.A. 52:14B-2(e) (definition of agency rule). The procedures established by the policy statement were (1) designed to have wide coverage encompassing a substantial segment of the prison population, (2) intended to apply generally and uniformly to similarly situated persons, (3) prescribed a legal standard or directive that was not otherwise provided, (4) reflected an administrative policy that was not previously expressed, and (5) constituted a general policy to be applied in future cases. The policy statement was thus imbued with all of the characteristics of an agency rule. See Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984); Crema v. New Jersey Dep't of Envtl. Protection, 94 N.J. 286, 463 A.2d 910 (1983); Texter v. Department of Human Servs., 88 N.J. 376, 443 A.2d 178 (1982); Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, 85 N.J. 325, 426 A.2d 1000, appeal dismissed, 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981). This much conceded, the defect was cured by the subsequent adoption of the regulations encompassing the policy statement. Cf. In re Madin/Lord Land Dev. Int'l, 103 N.J. 689, 695, 512 A.2d 490 (1986) (subsequent adoption of regulation rendered issue moot); In re Producer Assignment Program, 261 N.J.Super. 292, 302-03, 618 A.2d 894 (App.Div.) (adoption of regulation cured procedural defect), certif. denied, 133 N.J. 438, 627 A.2d 1144 (1993).
We come then to the principal issue presentedwhether Blyther had a liberty interest subject to due process protection in remaining in the general prison population. It has been said that there is no "iron curtain" drawn between the Constitution and the prisoners of this country, and that inmates cannot be "deprived of life, liberty or property without due process of law." Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950-51 (1974); see also Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); New Jersey State Parole Bd. v. Byrne, 93 N.J. 192, 460 A.2d 103 (1983); Avant v. Clifford, 67 N.J. 496, 341 A.2d 629 (1975). While this principle can be articulated with disarming ease, defining the metes and bounds of an inmate's constitutional protections requires an "intricate balancing of prison management concerns with prisoners' liberty." Sandin v. Conner, 515 U.S. 472, 478, 115 S.Ct. 2293, 2297, 132 L.Ed.2d 418, 426 (1995) (citing Wolff v. McDonnell, 418 U.S. at 556-58, 94 S.Ct. at 2974-76, 41 L.Ed.2d at 950-52.) Prisons are dangerous places. The courts must afford appropriate deference and flexibility to State officials trying to manage a volatile environment. Wolff v. McDonnell, 418 U.S. at 561-63, 94 S.Ct. at 2977-78, 41 L.Ed.2d at 954-55. Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life.
These considerations led the United States Supreme Court in Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418, to narrowly define the liberty interests of prisoners "in determining the amount of process due." Id. at 478, 115 S.Ct. at 2297, 132 L.Ed.2d at 426. While recognizing that states may create liberty interests that are constitutionally protected, id. at 483-84, 115 S.Ct. at 2300, 132 L.Ed.2d at 429, the Court said that "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484, 115 S.Ct. at 2300, 132 L.Ed.2d at 430 (citations omitted); see also Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (visitor exclusion does not infringe upon a liberty interest); Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (discretionary interstate transfer does not infringe upon a liberty interest); Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 *401 (1983) (transfer to less amenable quarters for nonpunitive reasons does not necessarily infringe upon a liberty interest); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (intrastate transfer does not infringe upon a liberty interest).
Our Supreme Court has taken a somewhat different approach. In Jenkins v. Fauver, 108 N.J. 239, 528 A.2d 563 (1987), the Court was concerned with the due process implications of a DOC directive requiring the Rahway State Prison Superintendent to relocate all inmates with prior homicide convictions from a satellite minimum security correctional facility to the main prison. The inmates claimed that they had a liberty interest in remaining in the satellite facility that could be taken away only after a full adjudicatory hearing. In sustaining the directive, the Court stressed that the reclassification was without regard to the prisoners' specific conduct and their individualized disciplinary records. Id. at 253-54, 528 A.2d 563. Finding no liberty interest in the prisoners' right to remain in a less restrictive custodial setting, the Court observed that no "useful purpose [would] have been served by an expansive hearing since the only issue to be resolved was whether the particular inmate's record reflected a prior conviction for homicide." Id. at 254, 528 A.2d 563.
Measured by the standard enunciated by the United States Supreme Court in Sandin, we find no liberty interest that has been impaired by the DOC's policy statement and the regulations subsequently adopted. Cf. Abed v. Commissioner of Correction, 43 Conn.App. 176, 682 A.2d 558, 561 (decision to deny inmates classified as safety threats the opportunity to earn good time credits did not rise to the level of constitutionally protected liberty interests), certif. denied, 239 Conn. 937, 684 A.2d 707 (1996). More specifically, it cannot fairly be said that the administrative assignment of gang leaders to the non-punitive STGMU program "imposes atypical and significant hardship on the inmate[ ] in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. at 484, 115 S.Ct. at 2300, 132 L.Ed.2d at 430. While concededly prisoners do not shed all constitutional rights at the prison gate, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356, 1369 (1948). Administrative transfer to less amenable quarters with the consequent loss of associational rights for nonpunitive purposes constitutes an ordinary incident of a prison sentence. We perceive no grievous or significant loss of liberty warranting application of procedural due process standards under the test adopted in Sandin.
More troublesome is whether compelled participation in the STGMU program raises due process implications under the standards adopted by our Supreme Court in Jenkins. To the extent that the prisoner's "individualized record" is considered in his transfer to the STGMU program, it is arguable that "the due process clause guarantees" the inmate must receive "a fair hearing." 108 N.J. at 251, 528 A.2d 563. Unlike the DOC's reclassification directive that was considered in Jenkins, identification of an inmate as a core member of a designated gang poses factual questions that can best be resolved through some kind of an adjudicatory hearing.
Having said this, we are satisfied that assignment of a prisoner to the STGMU program does not require the protection of the full panoply of rights attendant to criminal trials or even those rights attendant to disciplinary hearings. Much as the management control unit considered in Taylor v. Beyer, 265 N.J.Super. 345, 627 A.2d 166 (App.Div.1993), the STGMU program is a nonpunitive unit assignment designed to anticipate and prevent potential threats to ordinary prison operation. The Legislature has vested in *402 the Commissioner broad discretionary power to "[d]etermine all matters of policy and regulate the administration of [penal] institutions...." N.J.S.A. 30:1B-6(g). He is specifically empowered to designate places of confinement for inmates, N.J.S.A. 30:4-91.1, and to transfer inmates from one institution to another, N.J.S.A. 30:4-85. Involvement of the courts in the day-to-day management of prisons would squander judicial resources with little offsetting benefit to anyone.
Against this backdrop, we are convinced that Blyther was afforded whatever process was due him. The DOC was entitled to consider Blyther's past acts, including his involvement in gang activity, in deciding to place him in a carefully monitored, structured custodial environment. That Blyther was perhaps unaware that his participation in a gang would have implications respecting his later prison assignment is of no moment. Retroactive application of the policy statement to Blyther's gang involvement poses no constitutional problem. We add that Blyther received a fair hearing. Although he was not present at the adjourned hearing date when Investigator Moore's report was submitted, he had previously been afforded a full opportunity to present evidence regarding the intake form and his admission that he was a member of the Five Percent Nation. He does not claim here that he had, or currently has, additional proof bearing on the question. In short, Blyther was present at all critical phases of the hearing.
Affirmed.
NOTES
[1] Only the Commissioner or Deputy Commissioner is authorized to designate a group of inmates as a security threat. N.J.A.C. 10A:5-6.5(a). Blyther does not challenge the Commissioner's designation of the Five Percent Nation as a security threat.