742 A.2d 162 (1999)
326 N.J. Super. 543
Sharief ALLAH, Petitioner-Appellant,
v.
DEPARTMENT OF CORRECTIONS, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted October 27, 1999.
Decided December 20, 1999.
*163 Sharief Allah, petitioner-appellant pro se.
John J. Farmer, Jr., Attorney General, for respondent-respondent (Joseph L. Yannotti, Assistant Attorney General, of counsel; Steven Smith, Deputy Attorney General, on the brief).
Before Judges KING, KLEINER and PAUL G. LEVY.
The opinion of the court was delivered by KLEINER, J.A.D.
Sharief Allah, a prisoner in the general population at Leesburg State Prison, was transferred on July 24, 1998, to the Security Threat Group Management Unit ("STGMU") at Northern State Prison. Allah appealed a Hearing Committee's decision to place him in the STGMU to the Administrator of the Northern State Prison. On September 1, 1998, the Administrator upheld the Hearing Committee's decision. In his appeal to this court, Allah raises ten points, set forth in the appendix to this opinion, challenging this transfer. Most of Allah's allegations were fully discussed in Blyther v. New Jersey Dep't of Corrections, 322 N.J.Super. 56, 730 A.2d 396 (App.Div.), certif. denied, 162 N.J. 196, 743 A.2d 848 (1999). See also Walker v. Dept. of Corrections, 324 N.J.Super. 109, 734 A.2d 795 (App.Div.1999).
In Blyther, Judge Baime stated:
[W]e are satisfied that assignment of a prisoner to the STGMU program does not require the protection of the full panoply of rights attendant to criminal trials or even those rights attendant to disciplinary hearings. Much as the management control unit considered in [Taylor v. Beyer, 265 N.J.Super. 345[, 627 A.2d 166] (App.Div.1993) ], the STGMU program is a nonpunitive unit assignment designed to anticipate and prevent potential threats to ordinary prison operation. The Legislature has vested in the Commissioner broad discretionary power to "[d]etermine all matters of policy and regulate the administration of [penal] institutions...." N.J.S.A. 30:1B-6(g). He is specifically empowered to designate places of confinement for inmates, N.J.S.A. 30:4-91.1, and to transfer inmates from one institution to another, N.J.S.A. 30:4-85. Involvement of the courts in the day-to-day management of prisons would squander judicial resources with little offsetting benefit to anyone.
[322 N.J.Super. at 67, 730 A.2d 396.]
Blyther specifically concluded that an inmate does not have a liberty interest in being assigned to the general prison population. Id. at 65, 730 A.2d 396 (citation omitted).
*164 Two points of error raised by Allah were not raised in either Blyther or Walker:
POINT VIII
APPELLANT WAS DENIED INALIENABLE CONSTITUTIONAL RIGHT TO FREELY SELECT OR REJECT A RELIGIOUS BELIEF SYSTEM, NECESSATATING [SIC] A REVERSAL.
POINT X THE PLACEMENT OF PLAINTIFF IN LONG TERM SEGREGATION BASED UPON HIS RELIGIOUS/CULTURAL BELIEFS VIOLATES THE FIRST AMENDMENT AND EQUAL PROTECTION.
We conclude that a transfer to STGMU does not interfere with Allah's right to freely select a religious belief system nor does it infringe on his religious/cultural beliefs in violation of the First Amendment or the Equal Protection Clause of the Fourteenth Amendment.
I
Based upon its suspicion that the amount of violence and disruption caused by inmates affiliated with gangs had increased to an intolerable level within the State's prison system, the Commissioner of the Department of Corrections ordered the Internal Affairs Unit within the Department of Corrections ("DOC") to investigate activities of prison gangs in the State's correctional facilities. The subsequent investigation found that over a period of one year, August 1996 to August 1997, inmates affiliated with prison gangs engaged in eighty-six incidents of disruption, including assault. The tally of those incidents included eleven incidents of assaults on DOC staff; twenty-nine incidents of assaults on inmates; fourteen incidents of demonstrations or riots within the prisons; thirteen incidents of the use of or the discovery of weapons in the prisons; and twelve incidents of the discovery of contracted assaults on DOC staff and inmates.
In December 1997, the Commissioner of the DOC determined that gang activity in State correctional facilities had risen to such a level as to pose a substantial threat to order and security in the prisons. The Commissioner created the STGMU at Northern State Prison in Newark which would segregate individuals who were either leaders or "core" members of five particular gangs that include the Five Percent Nation, a/k/a the Nation of Gods and Earths. When segregated in the STGMU, the inmates placed there would participate in a behavior modification program and would, it was anticipated, renounce their gang membership. Through these efforts, the Commissioner believed: (1) that the inmates in gangs operating within the DOC facilities would lose the power over other inmates and possibly even over staff that they had gained; (2) that inmates who are key to gang activity would be segregated from others and thus could not lead the gangs or carry out their directives; and (3) that inmates who had not yet affiliated with a gang would be dissuaded from gang membership. See State of New Jersey, Department of Corrections, Security Threat Group Management Unit Overview 1-3 (August 1998).[1]
II Allah contends that the regulations pertaining to the STGMU violate his right to free exercise of religion by unconstitutionally targeting his beliefs. We disagree. Constitutional guarantees may be infringed by institutional restrictions that forward the central correctional objective of safeguarding institutional security. See Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447, 473 (1979).
*165 While prisoners retain constitutional rights, the Supreme Court has stated "these rights must be exercised with due regard for the `inordinately difficult undertaking' that is modern prison administration." Thornburgh v. Abbott, 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459, 469 (1989) (citing Turner v. Safley, 482 U.S. 78, 85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64, 76 (1987)).
Acknowledging the expertise of [prison] officials and that the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.
[Thornburgh, supra, 490 U.S. at 407-08, 109 S.Ct. at 1878-79, 104 L.Ed.2d at 469 (citing Procunier v. Martinez, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224, 235 (1974)).]
The relevant inquiry is whether the actions of prison officials were "reasonably related to legitimate penological interests." Thornburgh, supra, 490 U.S. at 409, 109 S.Ct. at 1876, 104 L.Ed.2d at 470 (quoting Turner, supra, 482 U.S. at 89, 107 S.Ct. at 2261, 96 L.Ed.2d at 79); see also O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (applying the "reasonably related" standard to prison regulation challenged under Free Exercise Clause of the First Amendment).
Thornburgh set forth four factors to determine whether a regulation is reasonably related to legitimate penological interests:
1. Whether the governmental objective underlying the regulations at issue is legitimate and neutral, and the regulations are rationally related to that objective;
2. Whether there are alternative means, which remain open to prison inmates, of exercising the allegedly infringed right(s);
3. The impact that accommodation of the asserted constitutional right will have on others in the prison; and
4. Whether there exists an obvious, easy alternative that fully accommodates the prisoner's rights at a de minimus cost to valid penological interests.
See Thornburgh, supra, 490 U.S. at 414-18, 109 S.Ct. at 1882-84 104 L.Ed.2d at 473-76; Turner, supra, 482 U.S. at 90-91, 107 S.Ct. at 2262, 96 L.Ed.2d at 79-80.
Allah has failed to specifically consider the Thornburgh factors or to fully demonstrate any infringement on his religious practices or beliefs.
We accept the argument of the DOC that it neither "targeted" a religion nor classified religious beliefs as a security threat group, but merely designated an association of inmates based on its history of violence as a security threat group. Additionally, the Supreme Court has determined "that the Turner reasonableness analysis applies whether a challenged regulation `effectively prohibit[s], rather than simply limit[s], a particular exercise of constitutional rights.'" Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 332 (3d Cir.1987) (quoting Estate of Shabazz, supra, 482 U.S. at 349 n. 2, 107 S.Ct. at 2404 n. 2, 96 L.Ed.2d at 290 n. 2) (alterations in original).
We also accept the DOC's observation that partial restrictions on Allah's association does not totally prevent the Five Percent Nation members from certain action. Religious expression is allowed in one's cell. Allah is free to pray, meditate, fast, and to receive a religious medal or prayer beads, prayer rug or prayer cap. Allah is not prohibited from possessing Islamic, Christian, or any other literature or lessons which do not uniquely pertain to or are not solely associated with the Five Percent Nation. Allah is "not foreclosed from expressing his political, social, or cultural view in other ways. Rather he is merely forbidden to engage in activities or to possess documents that refer to an unauthorized organization." Leitzsey v. *166 Coombe, 998 F.Supp. 282, 287 (W.D.N.Y. 1998).
Allah's claim that his equal protection rights are being violated is also not persuasive. The Turner standards apply to prisoner's equal protection claims of infringements of fundamental constitutional rights. See Washington v. Harper, 494 U.S. 210, 223, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178, 190 (1990); Allen v. Cuomo, 100 F.3d 253, 261 (2d Cir.1996).
For the reasons expressed in Blyther, supra, and based upon our analysis, Allah's appeal from his placement in STGMU must be rejected.
Affirmed.
APPENDIX
POINT I
THE APPLICATION OF THE SECURITY THREAT GROUP PROCEDURES TO THE FIVE PERCENT NATION VIOLATES THE FIRST AMENDMENT.
POINT II
THE NEW JERSEY DEPARTMENT OF CORRECTIONS DESIGNATION OF THE FIVE PERCENT NATION AS A SECURITY THREAT GROUP IS UNCONSTITUTIONAL.
POINT III
THE BOARD CLASSIFICATION OF THE FIVE PERCENT NATION AS A SECURITY THREAT GROUP WAS BASED UPON ITS RELIGIOUS TEACHINGS.
POINT IV
THE SECURITY THREAT GROUP REGULATIONS PUNISH INMATES WHO SINCERLY [SIC] BELIEVE IN THE TEACHINGS OF THE FIVE PERCENT NATION.
POINT V
STRIKING THE SECURITY THREAT GROUP REGULATIONS, AS APPLIED WILL HAVE LITTLE IMPACT ON THE NEW JERSEY DEPARTMENT OF CORRECTIONS.
POINT VI
APPELLANTS PLACEMENT WITHIN THE STGMU WAS A DIRECT RESULT OF INTERNAL AFFAIRS, TRUMPT UP CHARGES.
POINT VII
APPELLANT DID NOT MEET CLOSE CUSTODY REQUIREMENTS, DUE TO THE LACK OF DISCIPLINARY TRACK RECORD.
POINT VIII
APPELLANT WAS DENIED INALIENABLE CONSTITUTIONAL RIGHT TO FREELY SELECT OR REJECT A RELIGIOUS BELIEF SYSTEM, NECESSATATING [SIC] A REVERSAL.
POINT IX
PLAINTIFF DID NOT MEET THE CRITERIA OUTLINED ON FORM 147-1 AND WAS DENIED THE ABILITY TO PRESENT A VIABLE DEFENCE [SIC] AT HEARING NECESSATATING [SIC] A REVERSAL.
POINT X
THE PLACEMENT OF PLAINTIFF IN LONG TERM SEGREGATION BASED UPON HIS RELIGIOUS/CULTURAL BELIEFS VIOLATES THE FIRST AMENDMENT AND EQUAL PROTECTION.
NOTES
[1] The STGMU was modeled after the State of Connecticut's "Security Risk Group Safety Threat Unit," which has survived court challenges. See Abed v. Commissioner of Correction, 43 Conn.App. 176, 682 A.2d 558, certif. denied, 239 Conn. 937, 684 A.2d 707 (1996); Santiago v. Commissioner of Correction, 39 Conn.App. 674, 667 A.2d 304 (1995).