762 A.2d 255 (2000)
335 N.J. Super. 227
Kevin JACKSON, Plaintiff-Appellant,
v.
DEPARTMENT OF CORRECTIONS, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted November 1, 2000.
Decided November 28, 2000.
Appellant submitted a pro se brief.
John J. Farmer, Jr., Attorney General, attorney for respondent (Michael J. Haas, Assistant Attorney General, of counsel; Todd J. Schwartz, Deputy Attorney General, on the brief).
Before Judges BAIME, WALLACE, Jr., and CARCHMAN.
*256 The opinion of the court was delivered by BAIME, P.J.A.D.
In response to escalating drug traffic in New Jersey prisons, the Department of Corrections (DOC) adopted a policy subjecting visitors to searches using Ion Scan machines and passive canine units. Kevin Jackson, an inmate, attacks the constitutionality of the recently adopted policy. We discern no violation of the prisoners' constitutional rights.

I.
On April 16, 1999, the DOC instituted a new policy designed to deter the introduction of controlled dangerous substances into New Jersey's correctional institutions. Under the policy, visitors seeking entry to any DOC prison facility may be searched by departmental staff using Ion Scan machines and search dogs. An Ion Scan machine is a small vacuum that is run over the visitor's hands and the outside of his pockets. Within five to ten seconds, it is able to determine the presence of illicit drugs. A dog trained to detect controlled dangerous substances is kept behind a chain-link fence. The dog is able to determine the presence of drugs without having physical contact with the visitor. The visitor is subject to a more intrusive search upon a positive finding by either the Ion Scan machine or the search dog. This may include the search of the visitor's vehicle. If no drugs are found despite the positive finding, the visitor is to be escorted from the prison grounds and is denied a visit on that particular day. If, despite a positive finding, the visitor refuses to be further searched, he is barred from prison visits for a longer period of time. Signs describing the new policy are to be posted at all prison facilities. Visitors may choose not to undergo an Ion Scan machine search or a passive canine search, but they will not be granted readmittance to the institution that same day.

II.
At the outset, we note that the present challenge to the constitutionality of the policy is advanced by an inmate, not a visitor. The question then is whether Jackson has the requisite standing to raise this issue.
Unlike its federal counterpart, our Constitution contains no express language confining the exercise of judicial power to deciding actual cases and controversies. Compare U.S. Const. art. III, § 2 with N.J. Const. art. VI, § 1. Our courts have, nevertheless, long held that we will not render advisory opinions or function in the abstract. Crescent Park Tenants Ass'n v. Realty Eq. Corp. of N.Y., 58 N.J. 98, 107, 275 A.2d 433 (1971). Nor will we entertain proceedings initiated by litigants who are mere intermeddlers, interlopers or strangers to the dispute. Id. at 107, 275 A.2d 433; see also Bergen County v. Port of New York Authority, 32 N.J. 303, 307, 160 A.2d 811 (1960); New Jersey Turnpike Authority v. Parsons, 3 N.J. 235, 240, 69 A.2d 875 (1949). Ordinarily, a litigant may not claim standing to assert the rights of third parties. Jersey Shore Medical Center-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 144, 417 A.2d 1003 (1980). This principle has particular efficacy where one seeks to vindicate the constitutional rights of strangers to the dispute. See In re D'Aconti, 316 N.J.Super. 1, 13, 719 A.2d 652 (App.Div.1998); State, DEPE v. Dopp, 268 N.J.Super. 165, 174, 632 A.2d 1270 (App.Div.1993); In re Ass'n of Trial Lawyers of Am., 228 N.J.Super. 180, 185, 549 A.2d 446 (App.Div.), certif. denied, 113 N.J. 660, 552 A.2d 180 (1988). The related doctrines of standing, justiciability, ripeness and mootness that have evolved over the years are incidents of the primary conception that judicial power is to be exercised to strike down governmental action only at the instance of one who is himself harmed, or immediately threatened with harm, by the challenged conduct. Poe v. Ullman, 367 U.S. 497, 504, 81 *257 S.Ct. 1752, 1756, 6 L.Ed.2d 989, 996 (1961). "In short, the judiciary does not have a roving commission to seek and destroy unconstitutionality." In re Ass'n of Trial Lawyers of Am., 228 N.J.Super. at 185, 549 A.2d 446.
Jackson claims that he has a direct and concrete liberty interest in receiving visitors. He asserts that this interest is protected by the Fourteenth Amendment's due process requirement. However, the United States Supreme Court has rejected the notion that an inmate has a liberty interest in unfettered visitation. Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506, 515 (1989); Block v. Rutherford, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438, 447 (1984). The denial of prison access to a particular visitor "is well within the terms of confinement ordinarily contemplated by a prison sentence," Hewitt v. Helms, 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675, 686 (1983), and does not "impose atypical and significant hardship ... in relation to the ordinary incidents of [inmate] life." Sandin v. Conner, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418, 429-30 (1995).
While we harbor deep reservations concerning Jackson's standing, we choose to decide this case on the merits. As we have noted, Jackson has no recognized liberty interest in having access to visitors under the federal constitution. However, our Constitution has been held to be the source of individual liberties more expansive than those conferred by its federal counterpart. See, e.g., State v. Novembrino, 105 N.J. 95, 144-45, 519 A.2d 820 (1987); State v.. Williams, 93 N.J. 39, 58-59, 459 A.2d 641 (1983); Right to Choose v. Byrne, 91 N.J. 287, 303, 450 A.2d 925 (1982); State v. Hunt, 91 N.J. 338, 344-45, 450 A.2d 952 (1982); State v. Alston, 88 N.J. 211, 226, 440 A.2d 1311 (1981); State v. Johnson, 68 N.J. 349, 353, 346 A.2d 66 (1975); Pollock, "State Constitutions as Separate Sources of Fundamental Rights," 35 Rutgers L.Rev. 707 (1983); Note, "The New Jersey Supreme Court's Interpretation and Application of the State Constitution," 15 Rutgers L.J. 491 (1984). Our Supreme Court has frequently resorted to the New Jersey Constitution in order to afford broader protection of certain personal rights than that afforded by analogous or identical provisions of the federal constitution. State v. Novembrino, 105 N.J. at 145, 519 A.2d 820. We do not suggest that prisoners in New Jersey institutions have a protectable right to have access to visitors under the State Constitution. But that possibility has sparked sufficient concern to compel our consideration of the issue on the merits.

III.
Inmates do not shed all of their constitutional rights at the prison gate. There is no iron curtain drawn between the Constitution and New Jersey prisoners. See New Jersey State Parole Bd. v. Byrne, 93 N.J. 192, 460 A.2d 103 (1983); Avant v. Clifford, 67 N.J. 496, 341 A.2d 629 (1975). While these principles can be articulated with disarming ease, our effort to define the metes and bounds of an inmate's constitutional protections requires an "intricate balancing of prison management concerns with prisoner's liberty." Sandin v. Conner, 515 U.S. at 478, 115 S.Ct. at 2297, 132 L.Ed.2d at 426 (citing Wolff v. McDonnell, 418 U.S. 539, 556-58, 94 S.Ct. 2963, 2974-76, 41 L.Ed.2d 935, 950-52 (1974)). "Prisons are dangerous places." Blyther v. New Jersey Dept. of Corrections, 322 N.J.Super. 56, 65, 730 A.2d 396 (App.Div.1999). The courts must afford appropriate deference and flexibility to corrections officers trying to manage a volatile environment. Ibid. (citing Wolff v. McDonnell, 418 U.S. at 561-63, 94 S.Ct. at 2977-78, 41 L.Ed.2d at 954-55). Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life. Ibid.
These concerns strongly militate in favor of upholding the DOC's policy. Contact *258 visits invite a host of security problems. Such visits are commonly known to serve as the conduit for introducing contraband into correctional institutions. Visitors can often conceal drugs or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers. These items can readily be slipped from the clothing of an innocent child or transferred by other visitors permitted close contact with inmates. Recognizing these dangers, the United States Supreme Court has sustained prison regulations sharply curtailing contact visits. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The Court has also upheld a blanket policy barring contact visits with pretrial detainees. Block v. Rutherford, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). In a similar vein, we have sustained the DOC's disciplinary practice of terminating contact visits for those inmates adjudicated guilty of violating the prison's rules pertaining to controlled dangerous substances. Walker v. Dept. of Corrections, 324 N.J.Super. 109, 734 A.2d 795 (App.Div.1999). In each of these cases, it was determined that the denial of contact visits was constitutionally inoffensive because the policy at issue was reasonably related to a legitimate governmental objective. See also Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (government "must be able to take steps to maintain security and order at [an] institution and make certain no weapons or illicit drugs reach detainees"); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir.1979) (jail authorities have a legitimate security concern in limiting exposure of inmates to drugs); Hodges v. Klein, 412 F.Supp. 896 (D.N.J.1976) (a penal institution has an interest in controlling the intraprison flow of contraband as well as protecting the prison guards and other inmates); State v. Manghan, 126 N.J.Super. 162, 313 A.2d 225 (Law Div.1973) (penal institutions have a duty to adopt reasonable procedures to insure that drugs are not available to inmates).
The question presented here is somewhat different. At issue is whether the DOC's policy is constitutionally infirm because it authorizes limited searches of prison visitors without reference to individualized suspicion. The United States Supreme Court has dispensed with the warrant and probable cause requirements where "special needs, beyond those normally associated with law enforcement, have been shown to make any other course impracticable." Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709, 717 (1987) (quoting New Jersey v. T.L.O., 469 U.S. 325, 351, 105 S.Ct. 733, 748, 83 L.Ed.2d 720, 741 (1985) (Blackman, J., concurring)). In the presence of "special needs," "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665-66, 109 S.Ct. 1384, 1390-91, 103 L.Ed.2d 685, 702 (1989); see also Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639, 661 (1989).
We, therefore, assess the constitutionality of a "special needs" search policy under the Fourth Amendment's more general requirement of reasonableness, "balancing the need to search against the invasion which the search entails." Camara v. Municipal Court, 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930, 940 (1967). The appropriate inquiry is "whether the government's need outweighs the individual's privacy interest." Dunn v. White, 880 F.2d 1188, 1193 (10th Cir.1989), cert. denied, 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990). We determine whether the asserted governmental interest "justifies the privacy intrusions at issue absent warrant or individualized suspicion." Skinner v. Railway Labor Executives' Ass'n, 489 U.S. at 621, 109 S.Ct. at 1415, 103 L.Ed.2d at 662-63.
*259 The Fourth Amendment does not afford a person seeking to enter a penal institution the same rights that an individual would have on public streets, in a car, or in a home. We have already noted that a prisoner does not have a due process right to unfettered visitation. A corollary rule is that a citizen does not have a right to unfettered visitation of a prisoner. In seeking entry to an institution having special security needs, the visitor acknowledges a lesser expectation of privacy. Blackburn v. Snow, 771 F.2d 556, 565 (1st Cir.1985).
The balance must be struck in favor of institutional security. In some ways, the DOC's newly adopted policy is less intrusive than other methods commonly used to screen prison visitors, such as pat-down frisks and metal detectors. We do not minimize the extent to which the privacy interests of visitors is invaded. One need only summon the image of barking guard dogs to recognize the difficulties presented. In the final analysis, however, prisoners and visitors all profit by heightened security because they make correctional institutions safer for all concerned.
We thus join the growing number of courts that have considered the issue and have upheld similar drug detection policies. See, e.g., Spear v. Sowders, 71 F.3d 626, 632 (6th Cir.1995); Romo v. Champion, 46 F.3d 1013, 1017 (10th Cir.1995); Ybarra v. Nevada Board of State Prison Commissioners, 520 F.Supp. 1000, 1003 (D.Nev.1981); Black v. Amico, 387 F.Supp. 88, 92 (W.D.N.Y.1974).
Affirmed.