89 A.3d 242

STATE OF NEW JERSEY, PLAINTIFF, v.
DAVID W. YOUNG, DEFENDANT.

Superior Court of New Jersey
Law Division
Criminal Part

Decided June 24, 2013.

*Brent A. Bramnick,* Assistant Prosecutor, for State of New Jersey (*Theodore J. Romankow,* Union County Prosecutor, attorney).

*John G. Cito* for defendant.

WOLFSON, J.S.C.

I.  Introduction

This matter comes before the court on two motions filed by defendant. For the reasons contained herein, defendant's motion to suppress evidence is denied, and defendant's motion in limine is granted in part.

Defendant is an inmate at the Union County Jail, awaiting trial in Middlesex County on charges of first degree attempted murder, second degree aggravated assault, second degree possession of a weapon for an unlawful purpose, and second degree unlawful possession of a weapon. The matter is scheduled for trial on September 10, 2013. In preparation for trial, defendant filed two motions with the court, a motion to suppress evidence regarding alleged witness tampering and threats contained in four letters mailed by defendant while he was incarcerated in the Union County Jail, and in the alternative, a motion in limine to redact portions of the letters to minimize the prejudicial effect of the jury hearing of his present incarceration.

II.  Factual Background and Procedural History

On January 3, 2011, Investigator John Marcelli and Sergeant Donald John of the Gang Investigations Unit in the Union County Jail requested and received permission from the prison administrator to monitor all of defendant's non-privileged correspondence during his incarceration. Marcelli and John reported that based on their intelligence, as well as defendant's self-reporting, defendant was a member of the Crips street gang. Their application to monitor defendant's correspondence pursuant to *N.J.A.C.* 10A:31–19.6(b) stated that "the request is a result of gathering intelligence within the Correctional Facility which reflects that each of the above inmates has some type of gang affiliation or are communicating with other known gang members through correspon-

dence." [1]

Having received authorization, the Gang Investigations Unit began monitoring defendant's outgoing mail. Specifically, three sealed envelopes, containing four separate letters, were opened and seized by the monitors.[2] For purposes of simplicity, the envelopes will be referred to by number in the order they were sent. The first envelope was addressed to "R. Johnson" in Elizabeth, New Jersey. The return address on the envelope accurately indicated the letter was sent from "D. Young, (Inmate # 193309) 15 Elizabethtown Plaza, Elizabeth, New Jersey 07202." The enclosed letter, addressed to "Roze," stated in pertinent part,

> But yo I'm kinda scared to go to trial while this pussy is in here, He farr around and go to trial and say some crazy shit. I heard you tried to stomp a mud hole in that nigga. LoL You already know I love ya niggas for that tru story.

The letter was signed "Cyco," which is alleged to be defendant's street name.

The second and third letters seized came from a single envelope, which was addressed to "Nathanial Price, # 194596," an inmate who was also alleged to be a member of the Crips street gang. The purported sender of the letter was falsely identified as "Joshua Durham, # 194666." [3] One of the letters contained within, addressed to "KO," read in pertinent part,

> heard wat happen down there. You already know love yall for that. True story yo tell Rose and lil monsta I said whatup. I heard nigga needed stitches in mouth. They said you went in on him lol. You should've got that nigga to write an affidavit saying they made him say what he said in the police station.

---

[1] The application was not specific to this defendant, but contained a list of several inmates suspected to be gang members or communicating with gang members. The administrator approved the investigators' requests as a group instead of an individual basis, without modification.

[2] One of the envelopes, the second chronologically, contained two letters.

[3] Prison records revealed that inmate number 194666 was assigned to Ruben Mejia, an inmate who spent approximately five days in the County Jail in November 2010.

Again, the letter was signed "CyCo." The third letter also contained in the same envelope is not the subject of this motion and therefore the court assumes it did not contain suspect statements.

The third and final envelope seized was addressed to "Ibn Ali, No. 169283D," another inmate incarcerated at the Garden State Youth Correctional Facility, a State Prison located in Yardville, New Jersey. This envelope correctly identified both defendant and his correct inmate number as the sender. The letter seized here, addressed to "490," read in pertinent part,

yea bra it did take me a minute. My bad. They be watches my mail so I don't be writing as much.... I go to trial next month. Hopefully, I don't lose. The nigga in here now. He went to 88 and got trashed. Now he in P.C.[4] I need you to write him and tell him to make that statement he said he was gone write taking his statement back. 88 said he still left if he don't testify. That's what I heard. At first I was mad but fuck it if it keeps me from getting smoked. But its getting close to my date.... If I lose its cause the homies allowed it. Niggaz could have been got him to take that shit back but did nothing. They was goochin with the nigga out there. So don't be mad at me for not copping out....

This letter, like the others, was signed "Cyco."

Based on the contents of the letters, Marcelli informed the Union County Prosecutor's Office on July 25, 2011, that defendant had engaged in witness tampering. In response, Union County Assistant Prosecutor Robert Rosenthal and Detective Ted Merced sought and obtained a search warrant for the intercepted correspondence, which was granted on September 14, 2011.

Defendant has filed the instant motion to preclude the State from introducing these letters in his upcoming trial, arguing in part that the correspondence was improperly seized in violation of his rights under the United States Constitution and the New Jersey Administrative Code. The State on the other hand argues that the letters were properly seized under the proscribed procedure and are admissible as probative of defendant's consciousness of guilt for the charges he now faces.

---

4 From the context of the letter, the court assumes "P.C." was intended as an abbreviation for "protective custody."

III.   Defendant's Motion to Suppress the Seized Letters

■   Defendant first argues that the State violated his Fourth Amendment right to privacy and First Amendment right to free speech by opening and reading the three sealed envelopes.   However, it has been well established that inmates have a reduced expectation of privacy while incarcerated as "imprisonment carries with it the circumspection or loss of many significant rights." *Hudson v. Palmer,* 468 *U.S.* 517, 524, 104 *S.Ct.* 3194, 3199, 82 *L.Ed.*2d 393, 401 (1984).   While housed in a correctional institution, an individual's person and possessions are always subject to search and seizure based on the compelling need for safety and security inside the institution.   *Id.* at 526, 104 *S.Ct.* at 3200, 82 *L.Ed.*2d at 403.   In fact, "society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security."   *Id.* at 528, 104 *S.Ct.* at 3201, 82 *L.Ed.*2d at 404.   The United States Supreme Court has therefore determined that the "fourth amendment proscription against unreasonable searches does not apply within the confines of the prison cell.   The recognition of privacy rights for convicted prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."   *Id.* at 526, 104 *S.Ct.* at 3200, 82 *L.Ed.*2d at 403.

Nevertheless, even though defendant's federal constitutional right to privacy was not violated, I must also determine whether his mail was properly seized under the New Jersey Administrative Code, which affords inmates greater protections than those afforded by the federal constitution.

In New Jersey, the inspection of an inmate's outgoing mail is regulated by *N.J.A.C.* 10A:18–2.7, which provides in pertinent part,

Inspection of outgoing correspondence

(a) Outgoing correspondence shall be reviewed by designated correctional facility staff to determine the sender.   If the sender of the correspondence cannot be identified, the correspondence shall be destroyed. . . .

. . . .

(d) Any outgoing correspondence addressed to someone other than those cited in (b) [5] above shall not be opened, read or censored unless there is reason to believe that the correspondence contains disapproved content (*see N.J.A.C.* 10A:18–2.14) and then only with the prior approval of the Administrator or designee.

(e) Outgoing correspondence which is opened pursuant to this subchapter shall, once reviewed and approved, be resealed and mailed promptly....

## Further, *N.J.A.C.* 10A:31–19.6 (emphasis added) provides,

Inspection of outgoing mail

(a) Outgoing correspondence shall be reviewed by designated adult county correctional facility staff to determine the sender. The Administrator may establish internal management procedures that stipulate if the sender of the correspondence cannot be identified, the correspondence can be destroyed.

(b) *Inmates shall be permitted to seal outgoing correspondence and such correspondence shall not be opened, inspected or censored unless there is evidence to suspect that there is contraband or disapproved content enclosed or that a criminal activity is involved.*

(c) Outgoing correspondence which is opened pursuant to this section shall be resealed and mailed promptly only when the correspondence does not contain contraband or disapproved content.

## "Disapproved content" is defined in *N.J.A.C.* 10A:18–2.14 as correspondence falling into one of the following categories,

1. The correspondence contains material, which is detrimental to the security and/or order of the correctional facility because it incites violence based upon race, religion, creed or nationality and a reasonable inference can be drawn, based upon the experience and professional expertise of correctional administrators, that it may result in the outbreak of violence within the facility;

2. The correspondence contains information on the following subjects that, based upon the experience and professional expertise of correctional administrators and custody staff and judged in the context of a correctional facility and its paramount interest in security, order and rehabilitation, is detrimental to the secure and orderly operation of the correctional facility:

. . . .

vii. Anything that might pose a threat to the safety, security or orderly operation of the correctional facility;

3. The correspondence contains information which appears to be written in code;

4. The correspondence contains information concerning activities within or outside the correctional facility which would be subject to criminal prosecution under the laws of New Jersey or the United States;

---

5 Section (b) refers to outgoing mail addressed to public officials, which is subject to a different procedure.

5. The correspondence incites violence or destructive or disruptive behavior toward:

i.  Law enforcement officers;

ii.  Department of Corrections or contract vendor personnel;

iii.  Correctional facility inmates, visitors and/or volunteers; or

iv.  Correctional facility protocols, programs or procedures ... [.]

As stated above, Marcelli requested and received authorization to open defendant's outgoing mail based on his statement that defendant (and others) had "some type of gang affiliation or is communicating with other known gang members through correspondence." Defendant argues that simply because an incarcerated individual is a suspected or an admitted gang member ought not necessarily compel the conclusion that all of his communications with the outside world are related to illegal activity. Therefore, the novel question to be addressed is whether defendant's admitted gang affiliation in this instance, where he has attempted to send outgoing mail to another purported gang member, objectively satisfies the constraints embodied in *N.J.A.C.* 10A:31–19.6(b).

The first letter, addressed to R. Johnson and sent from defendant, was properly addressed to an individual that was not incarcerated and the sender's correct address and inmate number were identified. Its seizure therefore was based solely on the admitted gang affiliation of the sender and suspected affiliation of the recipient.

Gangs, or security threat groups as they are known in corrections institutes, obviously jeopardize the safety of a penal institution as they promote disruption, drug trafficking, intimidation, and perhaps most significantly, violence directed at non-affiliated inmates and corrections staff. Prison gang members have also been documented to have directed criminal activities outside of the prison walls.

Managing gangs therefore requires prison officials to have a comprehensive strategy to identify gang members, prevent their criminal activities, and mollify the threat they pose to institutional

security. The New Jersey courts have found that since "prisons are dangerous places ... [t]he courts must afford appropriate deference and flexibility to State officials trying to manage a volatile environment. Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life." *Blyther v. N.J. Dep't of Corr.*, 322 *N.J.Super.* 56, 65, 730 *A.*2d 396 (App.Div. 1999) (citing *Wolff v. McDonnell*, 418 *U.S.* 539, 561, 94 *S.Ct.* 2963, 2977–78, 41 *L.Ed.*2d 935, 954–55 (1974)). And while the court recognizes that outgoing mail presents a somewhat lesser security risk to the institution than perhaps attaches to incoming mail, the presence and activity of gangs in a correctional facility present a serious and inescapable threat not only to incarcerated individuals and corrections staff, but to the surrounding communities as well. Contained in that outgoing mail could be escape plans, contraband, or directions to other affiliated individuals to carry out illegal activities both in the outside world and within the prison itself. To better equip themselves against this ever-looming danger and heightened risk of criminal activity, prison officials must be ever-vigilant and continually seek information to better assist them to prevent dangerous or illicit dealings before they occur.

Given these considerations, I am entirely satisfied that the investigator's request to the prison administrator, and the administrator's subsequent approval of the seizure of the envelopes addressed to a suspected gang member, were based upon sufficient information "to suspect" that "disapproved content" or "criminal activity" was involved. Accordingly, under the heightened provisions of *N.J.A.C.* 10A:31–19.6(b), the investigators were authorized to seize and open this envelope and read its contents.

The remaining letters addressed to Ali and Price were also properly seized and inspected as well, but this conclusion is not dependent upon an analysis of *N.J.A.C.* 10A:31–19.6(b) or the "suspected" content of the envelopes. Instead, because both recipients of the remaining two letters were incarcerated in New Jersey correctional facilities when the mail was sent to them, a different regulation applies. Inmate-to-inmate communications

are regulated by a different, section of the Administrative Code, *N.J.A.C.* 10A:18–2.5, which provides in relevant part, "Correspondence to or from other inmates: (a) All inmate correspondence to or from other incarcerated inmates may be read to ensure that the correspondence does not contain any content prohibited by *N.J.A.C.* 10A:18–2.14."

Unquestionably, the investigators were authorized to open and review defendant's communications with other incarcerated inmates without any prior approval of the facility's administrator, and could do so without any articulable suspicion of prohibited content.[6] Therefore these envelopes and the letters contained therein were properly seized and turned over to the Union County Prosecutor's Office pursuant to the search warrant.[7] Accordingly, defendant's motion to suppress the letters contained in the three envelopes is denied.

IV.   Defendant's Motion in Limine

*N.J.R.E.* 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." However, "such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." *Ibid.*

---

[6] Defendant's letter to Price was also properly seized because it incorrectly identified the sender as a former inmate who was no longer incarcerated, with an invalid identification number.

[7] In addition, all inmates, including defendant, are provided with an "Inmate Orientation Handbook" when they arrive at the jail. Included in this handbook is information regarding the Administrative Code sections regarding the protocols and regulations regarding searches and seizures of items, including outgoing mail.   Furthermore, it is clear from defendant's own statements that he was aware the Union County Jail may have been reviewing his outgoing mail and he was taking steps to guard against that possibility.   In defendant's own words, in his third letter he stated, "They be watches my mail so I don't be writing as much."

*N.J.R.E.* 404(b) is designed to prevent the defendant from being "prejudiced by evidence of other acts such that a jury will convict because he or she is a bad person disposed to commit crime." *State v. Moore*, 113 *N.J.* 239, 275, 550 *A.*2d 117 (1988); *see also State v. Reddish*, 181 *N.J.* 553, 608, 859 *A.*2d 1173 (2004) (stating that other crime evidence has a unique tendency to turn a jury against the defendant and poses a distinct risk of distracting the jury); *State v. Koskovich*, 168 *N.J.* 448, 482, 776 *A.*2d 144 (2001) (observing that "evidence of a defendant's other crimes, wrongs, or acts may not be admitted into evidence to prove a defendant's criminal disposition as a basis for proving guilt of the crimes charged"). Furthermore, evidence admitted under *N.J.R.E.* 404(b) is still subject to the strictures of *N.J.R.E.* 403, under which even relevant evidence should be excluded "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." A proper application of *N.J.R.E.* 404(b) therefore "balances the State's interest in presenting evidence of 'other crimes or wrongs' against the possibility of unfair prejudice to defendant." *State v. Cofield*, 127 *N.J.* 328, 334, 605 *A.*2d 230 (1992).

The New Jersey Supreme Court in *Cofield, supra*, 127 *N.J.* at 338, 605 *A.*2d 230 articulated a four part test to determine the admissibility of a defendant's prior crimes wrongs or acts pursuant to *N.J.R.E.* 404(b). The four prongs discussed below are: (1) it must be relevant to a material issue; (2) it must be similar in kind and reasonably close in time to the offense charged; (3) it must be clear and convincing; and (4) the probative value of the evidence must not be outweighed by the apparent prejudice.

1. Relevancy

The first factor to consider is whether the act is "relevant to a material issue." Here, the State claims that the evidence is relevant to defendant's "consciousness of guilt" in regard to his pending charges. While evidence of a subsequent action is not

typically probative of guilt, under certain limited circumstances, a jury may use subsequent conduct to infer a defendant's consciousness of guilt where it is reasonable to do so. *State v. Wilson,* 57 *N.J.* 39, 49, 269 *A.*2d 153 (1970). Our courts have long held that threats made by a defendant to intimidate or induce a witness not to testify are relevant to the subsequent trial because it illuminates a consciousness of guilt. *See State v. Rechtschaffer,* 70 *N.J.* 395, 414, 360 *A.*2d 362 (1976) (noting that "[t]hreats to, accompanied by gestures at, a particular person which would appear to be more prejudicial to a defendant since they constitute an assault as distinguished from the expression here, have been held properly evidential[ ]"); *State v. Thompson,* 59 *N.J.* 396, 408–09, 283 *A.*2d 513 (1971) (defendant's statement that if he found out the identity of his informer, he would "kill him," was admissible); *State v. Hill,* 47 *N.J.* 490, 500, 221 *A.*2d 725 (1966) (testimony was allowed to show that defendant, after trial, accosted a witness and threatened to kill him if the witness took the stand), *State v. Buhl,* 269 *N.J.Super.* 344, 364, 635 *A.*2d 562 (App.Div.) *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994) (upholding the admissibility of a letter from the defendant requesting another inmate to kill the victim to prevent her testimony).

Similarly, the State argues here that the letters are relevant as tending to show consciousness of guilt as they demonstrate defendant's desire to coerce a witness through threats of bodily harm to recant his incriminating statement to the police. While expert testimony may be required to further clarify the suspected import of the letters and the witness intimidation or threats allegedly contained herein, such conduct may well be relevant and material to the issue of defendant's consciousness of guilt if properly and adequately demonstrated at a *Rule* 104 hearing. Its ultimate admissibility will, of course, be dependent upon the trial judge's application of *Rule* 403 and whether, even though relevant, the probative value of the letters is substantially outweighed by the risk of undue prejudice.

## 2. Similarity

Generally *Cofield, supra*, 127 *N.J.* at 338, 605 *A.*2d 230, requires that other crimes evidence be similar to the evidence of the charged crimes as well as be reasonably close in time to the charged offense. However, the court in *State v. Williams*, 190 *N.J.* 114, 131, 919 *A.*2d 90 (2007), recognized that this factor is not found in the language of *N.J.R.E.* 404(b) and therefore "need not receive universal application in *Rule* 404(b) disputes."

Here, the threats of violence by defendant were made while incarcerated waiting for trial. Thus, although the exact intercept dates of these letters has not been specified to the court, the court is satisfied that they are sufficiently close in time to satisfy any prerequisite in this regard. In addition, the threats of violence made against the witness are similar in nature to the crimes he is currently pending trial for, attempted murder and aggravated assault.

## 3. Clear and Convincing Evidence

While it is likely that expert testimony may well be required to explain the meaning of some of the expressions contained in defendant's correspondence, the letters contain clearly identifiable threats. Assuming their proper authentication at trial (as originating from the defendant) the evidence that defendant wrote these statements must be "clear and convincing" to the trial judge in a *Rule* 104 hearing.

## 4. Probative Value Outweighs Prejudice

Evidence claimed to be unduly prejudicial "can be excluded only where its probative value is so significantly outweighed by its inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issues of the case." *State v. Covell*, 157 *N.J.* 554, 568, 725 *A.*2d 675 (1999)(internal citations and quotation marks omitted). Additionally, "a court must consider the avail-

ability of other evidence that can be used to prove the same point." *Id.* at 568, 725 *A.*2d 675.

If evidence of other bad acts is admitted, the court "must take appropriate steps to reduce the inherent prejudice of that evidence by considering whether it can reasonably be presented to the jury in a less prejudicial form, and, when necessary, requiring the evidence to be presented to the jury in a sanitized form." *State v. Collier,* 316 *N.J.Super.* 181, 195, 719 *A.*2d 1276 (App.Div. 1998). Additionally, a trial court must make a limiting instruction and jury charge that "clearly and unambiguously explain[s] the limited relevance of the other-crime evidence, specifically advis[ing] the jury of the limited purpose for which the evidence could be used, and advis[ing] the jury as to the purpose for which the evidence could not be used, including an admonition that the other-crime evidence cannot be used to prove defendant's general predisposition to commit the offenses with which he was charged." *Id.* at 197, 719 *A.*2d 1276.

If ultimately admitted into evidence, the court can reduce the prejudicial effect of the evidence by redacting portions of the letter which indicate it originated from the county jail, and sanitize how the State came into possession of the envelopes. Likewise, a limiting instruction can be given to the jury directing that the evidence may be considered by them, but only to the extent they believe it to be probative of or relevant to defendant's consciousness of guilt.

## CONCLUSION

In conclusion, the court is satisfied that the State has presented a prima facie showing that the seized letters are both relevant and admissible, for the limited purpose of demonstrating defendant's consciousness of guilt. Subject to the trial judge's determinations at an appropriate *Rule* 104 hearing, defendant's motion to suppress is denied, and his motion in limine to redact those portions of the letter which identify the sender as incarcerated and to

sanitize the manner in which the letters came into the State's possession is granted.

The State shall submit an appropriate form of order, incorporating the terms of this opinion by reference, under the five-day rule.