986 A.2d 22 (2010)
411 N.J. Super. 316
Joseph BERNSTEIN, individually and as Administrator Ad Prosequendum of the Estate of Alexander Bernstein, and Ann Marie Tallon, Plaintiffs-Appellants,
v.
STATE of New Jersey, New Jersey State Department of Corrections, East Jersey State Prison, SCO Stacy Grant, SCO Robert Tone, SCO Ronald Williams, SCO Desma Flores, SCO Gabriel Baez, SCO Diane Palmer, Sgt. Robert Bonilla, Sgt. Robert Mitchell, SCO George Colello, Sgt. Robert Lapenta, SCO Bryant Flores, Captain Francis Pascucci, SCO Vincent Alberto, SCO Lawrence Artist, SCO Douglas Frank, Lt. Dennis Walsh, Hrysso Fernbach Psy.D., Dr. Miller, Donald R. Reeves, M.D., LCSW Valerie L. Yorker, and LCSW Adrian Serafin, Defendants, and
Commissioner Devon Brown, Chief of Staff Charles Ellis, Administrator Terrance Moore, Lt. James Mattia, Sgt. John Cunningham, Acting Director of Custody Operations Joseph Ring, Lt. Joseph Cifelli, SCO Gerard Sheehan, SCO Eleanor Houston, SCO Robert Maretz, SCO Patrick Scully, Sgt. Myron Popowych, SCO Douglas Smith, SCO Douglas Rokisky, SCO Milton Alexander, SCO Eric Hastings, SCO Keith Smith, SCO Linda Boswell, Sgt. Robert Mikulak, Sgt. Michael Morris, Assistant Superintendent Michael Power, Assistant Chief Administrator Christopher Hammer, Defendants-Respondents.
No. A-1601-08T3.
Superior Court of New Jersey, Appellate Division.
Submitted December 8, 2009.
Decided January 11, 2010.
*26 O'Connor, Parsons, & Lane, L.L.C., attorneys for appellants (William R. Lane, of counsel; Jose D. Roman, Old Bridge, on the brief).
Anne Milgram, Attorney General, attorney for respondents (Melissa H. Raksa, Assistant Attorney General, of counsel; Karen L. Jordan, Deputy Attorney General, on the brief).
Before Judges CARCHMAN, PARRILLO and ASHRAFI.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Plaintiff Joseph Bernstein, administrator ad prosequendum of the estate of his son, Alexander Bernstein, appeals from the September 30, 2008 summary judgment dismissal of his state common law tort and federal civil rights lawsuit against the State of New Jersey, its Department of Corrections (DOC), East Jersey State Prison, and numerous DOC officials and employees (collectively, State defendants).[1] We affirm.
The facts, viewed most favorably to plaintiff, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), are as follows. Seconds before 7:00 a.m. on May 5, 2004, plaintiff's decedent, Alexander Bernstein, was attacked and killed by a fellow inmate, Hassan Doss, during breakfast in the inmate dining room (IDR) at East Jersey State Prison. Doss had been sitting at a table, when he suddenly ran to where Bernstein was standing and began the attack. Bernstein was beaten for approximately four-and-one-half minutes before an emergency response team ended the incident.
As soon as he saw Doss attack, Sergeant John Cunningham, one of several corrections officers observing the mess hall from protective cages suspended above the mess hall floor,[2] immediately activated the riot *27 bell, then used a bullhorn to direct Doss to end the attack. When Lieutenant James Mattia, the shift commander, heard the riot bell, he alerted the star sergeant as to the incident's location, and activated the riot alarm system. Video cameras were then directed at Doss. Upon hearing the riot bell, designated officers reported to the ready room.
Two emergency response teams, each manned by twelve officers and one supervisor, assembled and donned their protective equipment, which took less than one minute. Once the teams were ready, Lieutenant Cifelli gave Cunningham the order to open the gate. Sergeants Popowych and Mikulak led the first team in while the second team remained in stand-by.[3]
The first team secured Doss, and reached Bernstein at 7:05:18 a.m. The victim's dire condition was immediately apparent, and the shift commander was notified by radio to call for an ambulance. Medical personnel were sent in after the IDR was secured, placing Bernstein on a gurney at about 7:08:18 a.m., approximately eight minutes and thirty-five seconds after the attack began. The nurses escorted Bernstein to the institutional hospital, which is approximately fifteen feet from the IDR's exit, and CPR was initiated. At 7:24 a.m., the Woodbridge Township Ambulance Rescue Squad arrived. Treatment continued, and at 7:30 a.m., paramedics from JFK Hospital arrived. At 7:36 a.m., Bernstein was pronounced dead by Dr. Hershkowitz of Correctional Medical Services (CMS), the independent contractor that provided medical services for the DOC.
Doss had multiple incidents of "[s]pecific assaultive behavior," while in prison, including one in 1994 resulting in the hospitalization of a corrections officer. Two of eight incidents in 1999 involved Doss cutting fellow inmates with a razor. In 2000, Doss pushed a corrections officer to the floor.
Doss has a history of paranoia and hostility. He had been prescribed antipsychotic medication in September 2001, but from late December 2003, was taking the medication only sporadically, despite the intense efforts of CMS psychiatrist Donald Reeve and psychiatric social worker Valerie Yorker to get Doss on a regular routine, lest he become more irritable. Dr. Reeve, at first, did not seek emergency or forced medication because he found Doss had not "behaved in an aggressive, provocative, or paranoid manner in the last two months." However, on March 18, 2004, a DOC sergeant brought Doss to Dr. Reeve's office, because a "wing officer note[d] that Mr. Doss [was] withdrawn and hostile and [did] not appear himself." Because of this shift in behavior, Doss was placed on suicide watch for a short while and then returned to his prison cell. On April 2, 2004, Dr. Reeve ordered that Doss be involuntarily injected with medication every two weeks for thirty days, beginning April 9, 2004, although he was not diagnosed as either suicidal or homicidal. Doss was injected again on April 23, 2004 and the next injection was scheduled for May 6, *28 2004, the day after he attacked Bernstein. On April 29, 2004, it was reported that Doss "was very clear in stating that he knows how to control his anger and he would never do anything to harm anyone here and he is not trying to intimidate staff, etc." In his meeting with Dr. Reeve the next day, Doss reiterated that he had "no thoughts of hurting himself or anyone else."
The corrections officers who were deposed testified that they did not have access to, or knowledge of, Doss' medical records, nor did they have information that would suggest that Doss was planning an attack. Terrance Moore, the prison's former administrator, denied any knowledge of Doss' violent history, and said he was never approached with concerns over Doss. He said that the March 18, 2004 incident where an officer brought Doss for psychological evaluation was not a rare occurrence, as "[i]t's not out of the ordinary" for an inmate to be brought to the mental health department. According to Moore, CMS has an obligation to alert DOC when, in its opinion, an inmate may harm himself or others, and Moore was not aware of any such communication between CMS and prison staff.
Neither were Lieutenant James Mattia, the shift commander stationed in the center control room at the time of the attack, Lieutenant Cunningham, or Lieutenant Myron Popowych aware of any of Doss' psychological problems in the months leading up to the attack. In fact, Captain Thomas Kirk, the area lieutenant on second shift at the time of the attack, characterized Doss as a "[r]ather quiet inmate [who] kept to himself for the most part."
Plaintiff filed a sixteen-count complaint against the State, the DOC, East Jersey State Prison, as well as forty-three individual defendants, including the DOC Commissioner, his assistant, the prison administrator, assistant superintendent, assistant chief, supervisors and numerous corrections officers, alleging state common law tort claims sounding in negligence (Counts I-IX), federal civil rights claims arising under 42 U.S.C.A. § 1983 (Counts X-XIII), derivative claims (Counts XIV-XV), and a claim for punitive damages. The basis of the complaint was that defendants' response to the attack was delayed by (1) a prison policy dictating supervision of the mess hall from protective cages above the floor rather than direct floor patrol and (2) a violation of a standing order by assembling two emergency response teams rather than one before interceding. Plaintiff alleged the consequent delay in treating Bernstein caused his death, and was the result of willful misconduct by the individual defendants. Plaintiff also sought to hold defendants liable for failing to remove inmate Doss from the prison's general population, as he suffered from psychological problems and had a history of violent behavior.[4]
In support of this theory, plaintiff presented the expert report of Thomas A. Rosazza, who found that "[w]ith respect to the initiation of CPR, the response time was insufficient and below the standard of care of the American Correctional Association Standards which require a four minute response time when an inmate is in cardiac and/or respiratory arrest." The expert opined that "[h]ad officers been posted in the IDR they would have been in position to begin CPR immediately after separating Mr. Doss from Mr. Bernstein...." In regards to the assembling of a second, stand-by team, Rosazza surmised *29 that "[t]o the extent that assembling the second team delayed the initiation of CPR beyond four minutes, such would be a violation of the standard of care for an emergency response." The expert further stated that "[t]he policy of removing the officers from the floor may have addressed officer safety, but it disregarded inmate safety by denying the inmates the most effective deterrent to inmate misbehavior, i.e., officer presence."
Defendants answered the complaint and following discovery, fifteen individual defendants were dismissed by stipulation, and two successfully moved for summary judgment, which is not at issue here. Plaintiff also voluntarily dismissed with prejudice Counts I to V of his complaint against all defendants because of the immunities granted them in the New Jersey Tort Claims (TCA), N.J.S.A. 59:1-1 to 12-3. Additionally, plaintiff voluntarily dismissed with prejudice all remaining claims against the State, the DOC and East Jersey State Prison. The remaining twenty-two defendants, all prison corrections officers or supervisors, moved for summary judgment.
Following argument, the judge granted the motion, dismissing the complaint against the remaining defendants. Specifically, as to Counts VI through IX, which alleged negligence related to Doss' treatment,[5] the court found that since a public entity could not be held vicariously liable for the wrongful misconduct of an employee, under both N.J.S.A. 59:2-10 and Hayes v. Pittsgrove Twp. Bd. of Educ., 269 N.J.Super. 449, 635 A.2d 998 (App.Div. 1994), the State, DOC, and the East Jersey State Prison were entitled to summary judgment. The court also found that since defendants, DOC Commissioner Devon Brown, his Chief of Staff Charles Ellis, and Prison Administrator Moore had no direct involvement in the incident, they could not have been acting outside the scope of their employment or with willful misconduct, and therefore they were protected by the TCA. As for the rest of the State defendants, the judge found that
The plaintiff correctly asserts that the State Defendants violated a standing order, that being post order 30.108.... The plaintiff asserts that the violation was to prepare a second team as backup....
... [T]he assembly of the back up team did not prevent or hinder the ... first team from entering into the I.D.R.... [N]o rational fact finder could conclude that it was wilful [sic] misconduct to take the extra step of preparing two teams in the face of a volatile potential in the mess hall where there were 300 unrestrained inmate[s] immediately after a brutal and unexpected attack, the genesis of which was unknown to the prison officials.
Similarly, with respect to prison policy removing officers from the IDR floor to suspended cages, the judge found that "[t]his evidence would be relevant to negligence but no [rational] fact finder could reasonably conclude that the facility's choice to use cages was wilful [sic] misconduct. Instead [it] was a policy choice with which the plaintiffs disagree." And as for Doss' presence in the prison's general population, the court opined that "[t]he treatment exception in N.J.S.A. 59:6-4, does not apply here because the plaintiffs are not claiming a malpractice in Bernstein's medical treatment. Instead their claim is *30 precisely the kind of claim that [is] immunized." Accordingly, the court concluded that the State employees were immune under the TCA from the negligence claims in Counts VI through IX.
Concerning Counts X through XIII, brought under 42 U.S.C.A. § 1983,[6] the judge, citing to Will v. Mich. Dep't of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), found that § 1983 liability does not apply to a State, state agency, or state official acting in his or her official capacity. For defendants Brown, Ellis, Moore, and Acting Director of Custody Operations Joseph Ring, the judge found that "the only acts complained of were purely of their official capacities as high level officials of the department of corrections. Thus, under the clear holding of [Will], dismissal of plaintiffs' claim[s] against these defendants under section 1983 is required."
Additionally, the court noted that in order to establish a § 1983 claim, plaintiff needed to show that the individual defendants violated Bernstein's constitutional rights. Citing Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the judge concluded:
Plaintiffs here cannot show that the decedent was incarcerated under conditions posing a substantial risk of serious harm. There was no allegation or evidence that the decedent alerted prison officials that he was in danger. In fact, there was no allegation or evidence that the decedent [ever] had a single prior physical altercation with inmate [Doss].
Moreover, there was also no allegation or evidence that prison officials were aware of inmate [Doss'] intentions to cause harm to the decedent.
The judge therefore granted summary judgment on Counts X through XIII. The court also dismissed the decedent's parents' derivative claims under Counts XIV and XV for loss of companionship.
Finally, as to Count XVI seeking punitive damages, the judge found that the TCA, specifically N.J.S.A. 59:9-2c, bars the recovery of punitive damages against a public entity. As for the remaining individual State defendants, the court, citing Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), found that plaintiff had "not established any evidence of the wilful [sic] conduct necessary to demonstrate that the individual State defendants acted with a high degree of conscious disregard for the plaintiff's [safety] and therefore an award of punitive damages cannot be supported in this case."
Plaintiff challenges each of these rulings on appeal.

I.
Having abandoned his tort claims against the State, the DOC, and East Jersey State Prison because public entities have no vicarious liability for the willful misconduct of their employees under the TCA, N.J.S.A. 59:2-10, plaintiff seeks to hold the individual State defendants accountable for their actions, which he claims transcend ordinary negligence and therefore fall outside the scope of TCA immunity. In this regard, plaintiff argues that genuine issues of material fact exist whether segregating corrections officers assigned to the mess hall in protective cages, preparing two response teams instead *31 of one in violation of a standing order, and allowing Doss to remain in the general prison population constitute willful misconduct so as to preclude the grant of summary judgment. We disagree.
The TCA is a comprehensive scheme that "seeks to provide compensation to tort victims without unduly interfering with governmental functions and without imposing an excessive burden on taxpayers." Greenway Dev. Co., Inc. v. Borough of Paramus, 163 N.J. 546, 552, 750 A.2d 764 (2000). Thus, "[e]xcept as otherwise provided by this [A]ct, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." N.J.S.A. 59:2-1(a) (footnote omitted). "This means that generally, immunity applies and `liability is the exception.'" Greenway Dev. Co., supra, 163 N.J. at 552, 750 A.2d 764 (quoting Fleuhr v. City of Cape May, 159 N.J. 532, 539, 732 A.2d 1035 (1999)).
Pertinent to the matter at hand, the Legislature decided, as a matter of policy, that "[n]either a public entity nor a public employee is liable for ... any injury caused by ... a prisoner to any other prisoner." N.J.S.A. 59:5-2(b)(4). The 1972 Task Force Comment to N.J.S.A. 59:5-2 emphasizes that the immunity protects the uniquely governmental function of housing prisoners convicted of crimes, which comes with inherent risks, from tort liability:
Subsection b(4) also recognizes the practical problems inherent in supervising prisoners and particularly in preventing injuries caused by one prisoner upon another. While it is necessary to provide supervision, the decision to do so for the purpose of preventing inter-prisoner injuries should not be threatened with tort liability nor should the actions of prison guards in reacting to situations which may give rise to such injuries.
[N.J.S.A. 59:5-2 cmt.]
To be sure, such immunity "is subject to an outer limit" and "willful misconduct" by a public employee is "expressly excluded from the scope of the [TCA's] immunity." Tice v. Cramer, 133 N.J. 347, 375, 627 A.2d 1090 (1993) (citing N.J.S.A. 59:3-14a). Although the public entity remains immunized because it has no vicarious liability for such acts of its employees, N.J.S.A. 59:2-10; Hayes v. Pittsgrove Twp. Bd. of Educ., supra, 269 N.J.Super. 449, 635 A.2d 998, "a public employee guilty of outrageous conduct cannot avail himself of the limitations as to liability and damages contained in this [A]ct." N.J.S.A. 59:3-14 cmt.
Willful misconduct "is not immutably defined but takes its meaning from the context and purpose of its use." Fielder v. Stonack, 141 N.J. 101, 124, 661 A.2d 231 (1995). In Fielder, the Court defined what constitutes "willful misconduct" in a police pursuit context:
[W]illful misconduct is ordinarily limited to a knowing violation of a specific command by a superior, or a standing order, that would subject that officer to discipline.
[Id. at 125, 661 A.2d 231].
We later explained that a police officer may deviate from a directive without his or her actions amounting to willful misconduct so long as the officer was not subjectively aware of the procedure and did not intentionally violate it. Kollar v. Lozier, 286 N.J.Super. 462, 472, 669 A.2d 845 (App.Div.) ("Without a knowing violation of an unequivocal order there can be no willful misconduct."), certif. denied, 145 N.J. 373, 678 A.2d 714 (1996).
For purposes of the TCA, willful misconduct has been defined as the "commission *32 of a forbidden act with actual knowledge that the act is forbidden." Id. at 470, 669 A.2d 845 (citing Marley v. Borough of Palmyra, 193 N.J.Super. 271, 294-95, 473 A.2d 554 (Law Div.1983)). It is conduct much more egregious than ordinary negligence. Fielder, supra, 141 N.J. at 123-27, 661 A.2d 231; Kollar, supra, 286 N.J.Super. at 470, 669 A.2d 845.
Here, after analyzing the facts, the motion judge concluded that there was an absence of willful misconduct given the lack of evidence that in assembling a two-response team emergency crew, defendants acted with actual knowledge they were violating an express, unequivocal order or command; that prison policy mandating use of elevated security cages unreasonably endangered the safety of inmates; or that defendants knew or had reason to know of Doss' mental health so as to have ordered his segregation from the general prison population. We concur in this result.
Without question, the summary judgment record established that in each of these instances, the individual State defendants were acting well within the scope of their employment and in full compliance with prison policies and procedures as they understood them to be. For instance, there was no proof that any State defendant knew that post order 30.108 called for only one team and intended to violate it by preparing a back-up crew. On the contrary, the deposed defendants all testified that it was their understanding that the two-response team approach was the prison's standard operating procedure in place at the time and, in fact, was officially adopted as policy shortly thereafter.
Moreover, under the terms of the order then in effect, there is some question whether it was even violated, knowingly or otherwise. Post order 30.108 contains no express prohibition against assembling a back-up team. Nor does it declare, in our view, a specific, unambiguous command, without an explicit or implied exception, that only one response team be used. Even if it did, the undisputed proof is that this procedure had long been overruled. Thus, no rational factfinder could conclude that in assembling a back-up emergency response team, the State defendants acted in a wrongful manner, much less willfully, egregiously or outrageously.
Even more certainly, the State defendants supervising the mess hall were acting in full compliance with official prison policy requiring guards be stationed in elevated security cages above the IDR floor. We simply cannot envision how obedience to such lawful procedures constitutes willful conduct on the part of the complicit corrections officers.
As for the administrator defendants responsible for its adoption and implementation, although plaintiff's expert opined that the cage enclosure policy was responsible for the delayed response, and therefore Bernstein's death, there is an absence of any proof either of the time of cardiac arrest, or, more significantly, that the use of protective cages to guard large groups of inmates deviates from a standard of care for correctional facilities. Indeed, we fail to discern how a jury could reasonably find liable for willful misconduct those individual defendants responsible for a policy that, on its face, accommodates the safety and security of both inmates and staff. In this regard, there has been no showing that the official decision to remove corrections officers from the IDR floor to suspended cages represents anything other than a reasonable attempt to balance concerns of officer security with those of inmate safety.
Similarly wanting is any proof of willful misconduct or deliberate indifference by allowing Doss in the general population. *33 No evidence has been presented that any State defendant knew of Doss' mental condition or had access to his medical records. Notably, Doss' assaultive behavior ended in 2001 when he was given treatment and prescribed medication. In any event, CMS was responsible for the provision of psychiatric services to Doss. On this score, there is no proof either that CMS ever advised prison officials that it was dangerous for Doss to be in the general population, or that the applicable standard of care required his administrative confinement or segregation for mental illness.
Even if defendants' treatment or diagnosis of Doss were negligent, the TCA provides immunity for injuries caused by: (1) the State's failure to make an adequate physical or mental examination of a person for the purpose of determining whether that person has a mental condition that would constitute a hazard to himself or others, N.J.S.A. 59:6-4; (2) failure to diagnosis a person with mental illness, N.J.S.A. 59:6-5; and (3) a determination regarding "(1) whether to confine a person for mental illness ... (2) the terms and conditions of confinement for mental illness... (3)[and] whether to parole, grant a leave of absence to, or release a person from confinement for mental illness...." N.J.S.A. 59:6-6. These immunities, in our view, apply here to shield the individual State defendants from liability in this instance.

II.
While in the absence of willful misconduct, the TCA operates to afford the individual State defendants immunity from the State tort claims in this case, it does not shield them from plaintiff's federal civil rights claim under 42 U.S.C.A. § 1983. Tice v. Cramer, supra, 133 N.J. at 375, 627 A.2d 1090; see also Fielder, supra, 141 N.J. at 133, 661 A.2d 231. The federal statute creates a "species of tort liability" in which "a plaintiff must show a violation of a right secured by the Constitution or laws of the United States committed by a person acting under color of state law." Kollar, supra, 286 N.J.Super. at 472-73, 669 A.2d 845 (citing Carey v. Piphus, 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252, 258 (1978); West v. Atkins, 487 U.S. 42, 48-49, 108 S.Ct. 2250, 2254-55, 101 L.Ed.2d 40, 48-49 (1988); Kirk v. City of Newark, 109 N.J. 173, 185, 536 A.2d 229 (1988)). Here specifically, plaintiff alleges that the State administrator defendants,[7] by removing corrections officers from the IDR floor to elevated cages, acted with deliberate indifference to a substantial risk of harm to the decedent, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. We find no evidential support in the record to warrant submission of this federal claim to the jury.
"Generally speaking, section 1983 provides a cause of action in state or federal courts to redress federal constitutional and statutory violations by state officials." General Motors Corp. v. City of Linden, 143 N.J. 336, 341, 671 A.2d 560, cert. denied, 519 U.S. 816, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996). While § 1983 allows an aggrieved party to bring suit for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws[,]" courts have found "only specific constitutional guarantees of the bill of rights incorporated into the Fourteenth Amendment (i.e., liberty and property interests protected by the Due Process Clause) and substantive fundamental limitations *34 on government action implicit in the liberty concept of the Fourteenth Amendment can form the basis for a § 1983 action." Delgado v. City of Newark, 165 N.J.Super. 477, 479-80, 398 A.2d 604 (Law Div.1979) (citing Paul v. Davis, 424 U.S. 693, 710, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405, 419 (1976)). That being said, a state or state official acting in his or her official capacity is immune from § 1983 damages-liability, as neither "are `persons' under § 1983." Will v. Michigan Dep't of State Police, supra, 491 U.S. at 71, 109 S.Ct. at 2312, 105 L.Ed.2d at 58.
The United States Constitution's Eighth Amendment prohibits cruel and unusual punishment, and is violated when prison officials act with deliberate indifference toward "a substantial risk of serious harm to an inmate." Farmer v. Brennan, supra, 511 U.S. at 828, 114 S.Ct. at 1974, 128 L.Ed.2d at 820. Such a constitutional violation provides grounds for a § 1983 claim.
[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious"; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.
The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety....
[Farmer, supra, 511 U.S. at 834, 114 S.Ct. at 1977, 128 L.Ed.2d at 823 (citations omitted).]
In defining "deliberate indifference," the Court held that a prison official
cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.
[Id. at 837, 114 S.Ct. at 1979, 128 L.Ed.2d at 825.]
Tempering a court's rigorous protection of inmates' constitutional rights is the fact that considerations of prison security are "peculiarly within the province and professional expertise of corrections officials," to which courts should give "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547-48, 99 S.Ct. 1861, 1878-79, 60 L.Ed.2d 447, 474 (1979); see Blyther v. N.J. Dep't of Corrections, 322 N.J.Super. 56, 65, 730 A.2d 396 (App.Div.) (State officials should be given wide latitude in managing the "volatile environment" presented by prisons, and are accordingly afforded "appropriate deference and flexibility"), certif. denied, 162 N.J. 196, 743 A.2d 848 (1999). Courts should avoid venturing "too cavalierly into areas that are properly the concern of [prison] officials[,]" as the United States Supreme Court has emphasized "time and again ... that [the] unguided substitution of judicial judgment for that of the expert prison administrators" is often "inappropriate." Bell, supra, 441 U.S. at 554, 99 S.Ct. at *35 1882, 60 L.Ed.2d at 478; see also Blyther, supra, 322 N.J.Super. at 67, 730 A.2d 396 ("[i]nvolvement of the courts in the day-to-day management of prisons would squander judicial resources with little offsetting benefit to anyone").
Here, since the plaintiff premises liability on a policy adopted by a State agency rather than any specific conduct by one of the named officials, the claim against the State officials acting in their official capacities is barred under principles of state sovereign immunity. Will, supra, 491 U.S. at 71, 109 S.Ct. at 2312, 105 L.Ed.2d at 58. But even assuming otherwise, we find no proof of an Eighth Amendment violation to support the § 1983 claim.
Undeniably, legitimate security concerns justified the policy choices of placing guards in protective cages above the IDR floor and equipping a back-up emergency response team. Consequently, neither procedure may reasonably be said to have been adopted with deliberate indifference or disregard to an excessive risk to inmate safety. Indeed, neither policy unduly or unreasonably delayed staff response time in this case.
In Hake v. Manchester Twp., 98 N.J. 302, 486 A.2d 836 (1985), the Court found no violation of the Eighth Amendment where the claim was failure to provide medical care. There, a detainee was found slumped in his cell with his belt around his neck. Id. at 308, 486 A.2d 836. The commanding officer decided not to initiate CPR, but instead waited for the Sheriff's Office and the prosecutor's photo unit to come to the scene. Id. at 308-09, 486 A.2d 836. The Court found that these facts did not show "deliberate indifference to serious medical needs of prisoners that constitutes the unnecessary wanton infliction of pain proscribed by the Eighth Amendment that states a cause of action under 42 U.S.C.A. § 1983." Id. at 317, 486 A.2d 836. "At most, the evidence [indicated] that the defendants may have erred in judgment." Ibid. As in Hake, where the officer's deliberate and delayed response was far more questionable than the officials' conduct here, we find no showing of intentional or wanton indifference to Bernstein's needs to allow recovery on the theory that plaintiff's decedent was deprived of his constitutional rights under the Eighth Amendment.

III.
Even if we were to assume, as plaintiff's expert opines, that different prison procedures might have allowed earlier intervention, we remain convinced there was no violation of a clearly established constitutional right. As such, the individual State defendants have a qualified immunity from liability under 42 U.S.C.A. § 1983.
As we recognized in Hart v. City of Jersey City, 308 N.J.Super. 487, 706 A.2d 256 (App.Div.1998):
The modern qualified immunity standard, introduced by Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and adopted by the New Jersey Supreme Court in Kirk v. City of Newark, 109 N.J. 173, 536 A.2d 229 (1988), applies to government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."
[Id. at 494, 706 A.2d 256 (quoting Harlow, supra, 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410).]
The essential inquiry in a qualified immunity analysis is whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional *36 right[,]" and if so, "whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 281 (2001); see also Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, 818, 172 L.Ed.2d 565, 576 (2009) ("On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").
In determining whether a right has been clearly established, its contours must be sufficiently clear so that a "reasonably competent officer" would have understood that he was violating a clearly established right. Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986). "`[B]ut if officers of reasonable competence could disagree on this issue, immunity should be recognized.'" Russell v. Coyle, 266 N.J.Super. 651, 656, 630 A.2d 396 (App.Div.1993) (quoting Malley, supra, 475 U.S. at 341, 106 S.Ct. at 1096, 89 L.Ed.2d at 278), certif. denied, 135 N.J. 302, 639 A.2d 302 (1994); see also Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523, 532 (1987); Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572, 578 (1980) (To be protected by qualified immunity, the official must show that "his conduct was justified by an objectively reasonable belief that it was lawful."); Schneider v. Simonini, 163 N.J. 336, 353-54, 749 A.2d 336 (2000), cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L.Ed.2d 959 (2001). Thus, in assessing "whether [a] right is clearly established[,]" the court ought not engage in "broad, abstract reasoning, but, rather, [its decision] should be based upon `particularized' considerations" in light of information the officer possessed at the time. Hart, supra, 308 N.J.Super. at 494, 706 A.2d 256 (quoting Anderson, supra, 483 U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531).
The qualified immunity defense is especially protective of law enforcement officers, as it "protects all officers `but the plainly incompetent or those who knowingly violate the law.'" Connor v. Powell, 162 N.J. 397, 409, 744 A.2d 1158 (quoting Malley, supra, 475 U.S. at 341, 106 S.Ct. at 1096, 89 L.Ed.2d at 278), cert. denied, Badgley v. Connor, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 251 (2000). As such
[q]ualified immunity balances two important intereststhe need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."
[Pearson, supra, 129 S.Ct. at 815, 172 L.Ed.2d at 573 (quoting Groh v. Ramirez, 540 U.S. 551, 567, 124 S.Ct. 1284, 1295, 157 L.Ed.2d 1068, 1085 (2004) (Kennedy, J., dissenting)).]
An affirmative defense to be established by the defendant, Schneider, supra, 163 N.J. at 354, 749 A.2d 336, qualified immunity is a question of law to be decided by the court. Wildoner v. Borough of Ramsey, 162 N.J. 375, 387, 744 A.2d 1146 (2000). Moreover,
where the factual context of the case permits, it is preferable to dispose of the qualified immunity emanations of a case in advance of trial. The reasons for this are fairness and procedural economy, avoiding disruption to government, and sparing the private parties the unnecessary costs and other demands posed by long, drawn out law suits, as well as conserving the public fisc.

*37 [Hart, supra, 308 N.J.Super. at 496, 706 A.2d 256 (citations omitted).]
Here, plaintiff argues that defendants' actions demonstrated a callous indifference to inmate safety and "deprived Bernstein of his constitutional right to adequate medical care." Yet, plaintiff offers no authority proscribing, as unconstitutional or violative of federal civil rights, the use of elevated protective cages to monitor mess hall activity or the use of two response teams instead of one. As to the latter, the facts undeniably show that the responding officers believed they were following proper prison procedure in assembling two emergency teams to react to a potentially volatile situation in the IDR. No factfinder, therefore, could rationally conclude that a reasonably competent officer, in responding to the Doss attack, would have understood that his actions, in accord with what was understood to be standard operating procedure, were violating inmate Bernstein's constitutional rights.
The same, of course, is true with respect to defendants' actions in supervising the mess hall from protective cages. Here, defendants were acting in full compliance with an established prison policy that sought to balance the competing concerns of officer and inmate safety. Clearly, defendants' actions were justified by the objectively reasonable belief that a policy that incorporated these mutual concerns was entirely lawful, and therefore it also cannot be said that defendants acted with plain incompetence or in knowing violation of the law. Connor, supra, 162 N.J. at 409, 744 A.2d 1158.
Thus, regardless of the label attached, we discern no clearly established or defined constitutional right so as to have noticed defendants that their actions were unlawful. As such, their actions are shielded from liability by a qualified immunity.

IV.
Having failed to establish either willful misconduct for the State common law tort claims, or a constitutional violation under § 1983, a fortiori there is insufficient evidence to present a claim for punitive damages to the jury.
As to the former, under N.J.S.A. 59:3-14(b), the individual State defendants are exposed to the "full measure of recovery applicable to a person in the private sector," including punitive damages, if the court finds that those defendants engaged in willful misconduct. See Toto v. Ensuar, 196 N.J. 134, 148, 952 A.2d 463 (2008). As noted, however, plaintiff has not offered any evidence of the willful conduct necessary to demonstrate that the individual State defendants acted with a high degree of conscious disregard for the decedent's rights, and therefore an award of punitive damages cannot be supported in this case.
Regarding plaintiff's federal civil rights claims against defendants other than high-level State officials sued in their official capacity, Will, supra, 491 U.S. at 71, 109 S.Ct. at 2312, 105 L.Ed.2d at 58, "`punitive damages are available in a "proper" § 1983 action....'" Smith, supra, 461 U.S. at 35, 103 S.Ct. at 1629, 75 L.Ed.2d at 638 (quoting Carlson v. Green, 446 U.S. 14, 22, 100 S.Ct. 1468, 1473, 64 L.Ed.2d 15, 26 (1980)). Thus, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Id. at 56, 103 S.Ct. at 1640, 75 L.Ed.2d at 651.
Here, the record speaks of no such "evil motive or intent," nor was there "reckless or callous indifference" towards decedent's constitutional rights. While plaintiff's expert *38 takes issue with the policy of removing officers from the IDR floor and the unwritten practice of assembling two response teams, these procedures, either singly or in combination, simply do not rise to the level of recklessness or callous indifference necessary for an award of punitive damages.
Affirmed.
NOTES
[1] Joseph Bernstein and his wife, Ann Marie Tallon, have also sued individually. For ease of reference, we will refer to plaintiff in the singular.
[2] Because of past instances where corrections officers were injured by unruly inmates through "organized group assaults ... in a variety of mess halls at different facilities as well as some incidents" at the East Jersey State Prison, the DOC Commissioner had adopted post order 30.108, implemented on May 22, 1996, which called for corrections officers to observe the IDR from cages suspended above the mess hall's floor rather than by patrolling the IDR on foot. The post order called for each of the three cages in the IDR to be staffed with a corrections officer. The officers were to be equipped with video cameras, a bullhorn, and access to a riot bell. Thus, the officers' duties were to observe the IDR, sound the alarm in case of emergency, use the bullhorn to order the combatants to cease and desist, and videotape any incident that occurred.
[3] At the time of this incident, post code 30.108, calling for one emergency response team of "one (1) supervisor and ten (10) officers", was still in effect. The "two response team" approach was not formalized until February 2005, nine months after the incident, by revised procedure number 10.021. The deposition testimony of the corrections officers, however, as well as the fact that procedure 10.021 itself cites to the Assistant Commissioner's directive of November 3, 1982, and the Director of Custody Operations memos, dated September 15, 1986, and December 30, 1986, strongly suggests that the "two response team" policy was in place, at least informally, well before revised procedure number 10.021 was memorialized in 2005.
[4] In an amended complaint, plaintiff asserted medical malpractice claims against CMS and its employees, Donald Reeve and Valerie Yorker, but these were eventually settled on November 6, 2008.
[5] Specifically, the complaint alleged: negligent examination or diagnosis for the purpose of treatment (Count VI); negligence in undertaking to prescribe for mental illness and administering treatment (Count VII); professional negligence (Count VIII); and conduct outside the scope of employment, actual malice, and/or willful misconduct (Count IX).
[6] Specifically, the complaint alleged: deliberate indifference to safety in failing to protect from harm in violation of 42 U.S.C.A. § 1983 (Count X); failure to use reasonable care to protect from a pervasive risk of harm under § 1983 (Count XI); deliberate indifference to safety, failure to protect, supervisory liability under § 1983 (Count XII); and deliberate indifference based on inadequate facilities under § 1983 (Count XIII).
[7] Brown, Ellis, Moore, Ring, Assistant Superintendent Michael Power and Assistant Chief Administrator Christopher Hammer.