**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2870-16T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WALTER HARRISON, a/k/a
WALTER M. MAURICE JOHNSON,
MAURICE HARRISON and MAURICE
JOHNSON,

    Defendant-Appellant.

_____

        Submitted May 16, 2018 – Decided June 28, 2018

        Before Judges Koblitz and Manahan.

        On appeal from Superior Court of New Jersey,
        Law Division, Mercer County, Indictment No.
        15-02-0244.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Stefan Van Jura, Deputy Public
        Defender, of counsel and on the brief).

        Angelo J. Onofri, Mercer County Prosecutor,
        attorney for respondent (Joseph Paravecchia,
        Assistant Prosecutor, of counsel and on the
        brief).

PER CURIAM

Defendant Walter Harrison appeals from his conviction after pleading guilty to one count of fourth-degree possession of a controlled dangerous substance (CDS). On appeal, defendant challenges the denial of his motion to suppress physical evidence recovered from his residence. We affirm.

On February 3, 2012, defendant was sentenced to a state prison term of five years and six months for possession of CDS with intent to distribute within 1000 feet of a school zone, N.J.S.A. 2C:35-7(a). The court imposed a mandatory minimum of two years and seven months' with credit for time served.

In 2014, defendant was released and placed on parole subject to certain conditions. One of the conditions imposed required that defendant was "to submit to drug or alcohol testing at any time as directed by the assigned parole officer." Another general condition provided that defendant "submit to a search conducted by a parole officer . . . [of his] place of residence . . . at any time a parole officer has a reasonable, articulable basis to believe that the search will produce contraband or evidence that a condition of supervision has been violated . . . ."

On February 26, 2015, a Monmouth County grand jury returned a six-count indictment charging defendant with fourth-degree possession of a CDS, N.J.S.A. 2C:35-10(a)(2) (count one); third-degree possession of a CDS with intent to distribute, N.J.S.A.

2C:35-5(b)(11) (count two); third-degree possession of a CDS with intent to distribute on or near school property, N.J.S.A. 2C:35-7(a) (count three); third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count four); second-degree possession of a firearm while committing a CDS offense, N.J.S.A. 2C:39-4.1(a) (count five); second-degree certain persons not to possess a firearm, N.J.S.A. 2C:39-7(b)(1) (count six).

The indictment was based upon defendant's arrest after a search of his residence by officers from the New Jersey State Parole Board (NJSPB). Defendant moved to suppress the physical evidence seized during the warrantless search.

During a hearing on the motion, the State presented a single witness, Lieutenant Alexander Falbo, of the NJSPB. We take the following from Falbo's testimony.

Falbo is the District Parole Supervisor for the Trenton District Office. At 10 a.m. on September 6, 2014, Falbo, along with other officers, was involved in a joint security operation at the "Opportunities for All Community Resource Center" (CRC). The CRC conducts rehabilitation programs for parolees who require assistance, including services for substance abuse.

Defendant was present at the CRC during the joint security operation. The purpose of the security operation was to look for weapons and contraband. In addition to a physical search and pat

down, the task force members administered both urine tests and ion scan tests to the individuals present. Both the pat down and the urinalysis test of defendant were negative for weapons or contraband. The ion scan of defendant was positive for fentanyl and marijuana.

Falbo described the ion scan and its application.

> [T]here is a wand with a piece of sample paper on it. The paper is then rubbed on different items, and then the paper is removed and put into this machine. [T]he machine is able to analyze based on the microparticles for gun powder, explosives and other narcotics and substances.
>
> In our case we have the same piece of machinery. . . . We rub it on [the] offender's hands, back, insides, backs of the hand, sometimes around the belt area or the pockets, and then the paper is removed from the wand. It's slipped into this machine and the machine analyzes it and gives out a reading on the screen and also a printed receipt of what it's analyzing and what it finds or doesn't find.
>
> . . . .
>
> It'll test for marijuana, heroin, cocaine, prescription medications that are considered scheduled. It'll test for drugs like fentanyl, other cutting agents. It'll test for baking soda, which is a cutting agent and used in heroin and cocaine distribution.
>
> . . . .
>
> [I]'m not an expert on how it works, but from what I've seen from the investigator that does

4

> do the examination that is trained in it, the
> machine cleans itself between each sample.[1]

A different piece of paper is used each time the scan is conducted. Falbo estimated he had "done a hundred assignments with the machine."

After consulting with his commanding officer about the positive result and defendant's criminal history, Falbo determined a search of defendant's home should be conducted with the use of the K-9 unit. Defendant was handcuffed and taken into custody. Falbo and other officers then proceeded to defendant's residence to conduct the search.

Upon approaching defendant's residence, "there was a strong odor of burnt marijuana coming from the front porch and front door area." A female answered the door and identified herself as defendant's girlfriend. Defendant's girlfriend admitted to smoking marijuana prior to the officer's arrival. Defendant's girlfriend was asked to exit the home whereupon the officers began the search with the K-9 unit. No one else was present in the home.

Upon command, the dog "bolted right up the stairs to the second floor, made a left right by the staircase and went into an

---

[1] The court limited Falbo's testimony to his personal observations or knowledge, as he was not admitted as an expert.

open room, a door that had an open room to it." In the room, which "seemed to be an area for storage," the dog alerted an officer to an unplugged "mini fridge." Inside, a large, clear bag of marijuana with five smaller bags within it was recovered. A Crosman BB gun in a black holster was also found in the mini fridge.

At the conclusion of the hearing, the judge denied the motion and stated her reasons on the record. Thereafter, defendant pled guilty to count one of the indictment. On December 9, 2016, the judge sentenced defendant to two years' probation with conditions. The remaining counts of the indictment were dismissed. This appeal followed.

On appeal, defendant raises the following points:

POINT I

THE EVIDENCE DISCOVERED IN DEFENDANT'S HOME MUST BE SUPPRESSED BECAUSE THE PAROLE OFFICERS SHOULD NOT HAVE USED THE RESULTS OF AN ION SCAN OF DEFENDANT TO JUSTIFY THE SEARCH OF HIS HOME.

[A.] THE ION SCAN OF DEFENDANT WAS A SEARCH WITHOUT PRE-EXISTING REASONABLE, ARTICULABLE SUSPICION, AS REQUIRED BY N.J.A.C. 10A:72-6.1(B).

[B.] THE STATE HAS NOT DEMONSTRATED THE ION SCANNER TO BE OF SUFFICIENT RELIABILITY TO JUSTIFY THE SEARCH OF DEFENDANT'S HOME.

THE WARRANTLESS SEARCH OF DEFENDANT'S HOME WAS UNREASONABLE BECAUSE THE STATE MADE NO EFFORT TO DETERMINE THE AREAS OF THE HOME THAT WERE UNDER THE EXCLUSIVE CONTROL OF ANOTHER, WHICH CANNOT BE SEARCHED WITHOUT WRITTEN VOLUNTARY CONSENT PURSUANT TO N.J.A.C. 10A:72-6.3(B).

Our review of a judge's decision on a motion to suppress evidence is limited. State v. Vargas, 213 N.J. 301, 326-27 (2013). We are obliged to uphold the motion judge's factual findings that are supported by sufficient credible evidence in the record. State v. Diaz-Bridges, 208 N.J. 544, 565 (2012) (citing State v. Locurto, 157 N.J. 463, 471 (1999)). Deference to those findings is particularly appropriate when the trial court has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We are not, however, required to accept findings that are "so clearly mistaken" based on our independent review of the record. Ibid. And we need not give deference to a judge's interpretation of the law and review legal issues de novo. Vargas, 213 N.J. at 327.

We commence our discussion with defendant's arguments regarding the ion scan conducted on his hands and clothing by a parole officer. Defendant first argues that an ion scan is a

"search" for Fourth Amendment purposes. Defendant further contends he did not consent to this search as a condition of his parole, for the ion scan test was not supported by a reasonable, articulable suspicion to believe defendant possessed contraband. In addition, defendant argues the positive ion scan result did not support reasonable suspicion to search his home.

The judge found that the ion scan did not violate the Fourth Amendment's proscription against unreasonable searches and seizures as "it is not objectively reasonable for a parolee to expect that he would not be subject to a[n] ion scan at a CRC event." In reaching this finding, the judge reasoned that a "parolee is in a different position from that of the ordinary citizen. He is still serving his sentence. He remains under the ultimate control of his parole officer. His parole is subject to revocation for reasons that would not permit the arrest or incarceration of other persons." As such, the judge found defendant consented to the ion search due to his parolee status. Accordingly, the judge found that, under the totality of the circumstances, the positive ion scan test provided reasonable suspicion for the officers to search his residence for evidence of CDS.

Parole allows an individual to complete the final portion of a sentence outside of prison but subject to specified conditions.

8

<u>State v. Black</u>, 153 N.J. 438, 447 (1998). A parolee does not enjoy the same freedoms as an ordinary citizen, but rather has conditional liberty subject to the observance of various parole requirements. <u>Morrissey v. Brewer</u>, 408 U.S. 471, 480 (1972).

A warrant is not needed to conduct a search of a parolee's home. <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873-74 (1987). The State only needs to show there were reasonable grounds to believe evidence of a probation violation would be found. <u>Ibid.</u> That is, parole officers can conduct a search of a parolee's residence if there is a reasonable articulable suspicion that such a search would discover evidence that the parolee's probation had been violated. N.J.A.C. 10A:72-6.3(a)(1). "'Reasonable suspicion' means a belief that an action is necessary based upon specific and articulable facts that, taken together with rational inferences from those facts, reasonably support a conclusion such as that a condition of parole has been or is being violated by a parolee." N.J.A.C. 10A:72-1.1.

A high-level supervisor or assistant district parole supervisor can provide the authorization for the search of a parolee's home under these circumstances. <u>See</u> <u>State v. Maples</u>, 346 N.J. Super. 408, 412-13 (App. Div. 2002) (stating that a parole officer can search a bag in a parolee's home when the officer has a reasonable suspicion that a condition of parole has been

violated).  In <u>Maples</u>, this court discussed <u>Griffin</u>, 483 U.S. at 873-74, in which the Supreme Court held that a probation officer's warrantless search of a probationer's home, based upon a tip from police, satisfied the Fourth Amendment.  <u>Id.</u> at 412-13.  We explained that a certain degree of governmental intrusion is allowable with regard to parolees, whereas similar conduct might be impermissible in a different scenario with an ordinary citizen. <u>Id.</u> at 413.

Here, defendant was a parolee with a reduced expectation of privacy.  N.J.A.C. 10A:71-6.4(a)(16) states that a parolee must "[s]ubmit to drug or alcohol testing at any time as directed by the assigned parole officer."  The record includes a copy of defendant's signed agreement to this condition of parole.  The ion scan is a machine that tests for the presence of drugs and only involves touching the outer clothing and hands of a person.  Thus, the positive result from the ion scan for marijuana and fentanyl was not an unreasonable search and instead suggested defendant violated the conditions of his parole.

Notwithstanding the positive result from the ion scan of defendant, we note another factor that provided reasonable suspicion.  Upon arriving at defendant's home and prior to the entry and search, the officers smelled burnt marijuana emanating from the front porch.  The plain odor independently provided

reasonable suspicion to enter defendant's home to search for evidence of CDS. See State v. Pena-Flores, 198 N.J. 6, 30 (2009) (citing State v. Nishina, 175 N.J. 502, 515-16 (2003)); State v. Myers, 442 N.J. Super. 287, 295 (App. Div. 2015). Hence, under the totality of the circumstances presented, we are satisfied that the parole officers had a reasonable suspicion that defendant violated the conditions of his parole.

Defendant also argues for the first time on appeal that the State did not demonstrate the reliability of the ion scan under Daubert/Frye.[2] "Generally, an appellate court will not consider issues, even constitutional ones, which were not raised below." State v. Galicia, 210 N.J. 364, 383 (2012). "'[T]he points of divergence developed in proceedings before a trial court define the metes and bounds of appellate review.' Parties must make known their positions at the suppression hearing so that the trial court can rule on the issues before it." State v. Witt, 223 N.J. 409, 419 (2015) (quoting State v. Robinson, 200 N.J. 1, 19 (2009)). "For sound jurisprudential reasons, with few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'" Ibid. (Robinson, 200 N.J. at 20).

_____

[2] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993); Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

We find no exceptions here. The opportunity to raise the issue of the test's scientific reliability was available and it could have been raised before the judge. During the hearing, the only objections to the reliability of the ion scan were that the parole officers did not comply with parole guidelines for conducting the test. On that score, given Falbo's extensive testimony as to the process employed in administering the test as well as our standard of review of evidentiary rulings, we discern no error in the consideration of the ion test results.[3] State v. Weaver, 219 N.J. 131, 149 (2014).

Finally, we conclude defendant's remaining argument relative to the scope of the search to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] Ion scan evidence was found to be admissible after a Daubert hearing in United States v. Hernandez-De La Rosa, 606 F. Supp. 2d 175, 178, 185-87 (D.P.R. 2009) ("[T]he [ion scan] technology is able to detect the presence of illegal drugs and analyze the relative quantity of such drugs present. . . . [T]his piece of evidence will 'assist the trier of fact to determine a fact in issue' . . . ."). Further, although not directly related to reliability, we have permitted the use of this type of testing in other contexts. See State v. Daniels, 382 N.J. Super. 14, 15-17 (App. Div. 2005) (affirming an order denying defendant's motion to suppress where defendant tested positive on an ion scan while visiting her son at a correctional facility and her vehicle was subsequently searched, revealing evidence of CDS); Jackson v. Dep't of Corr., 335 N.J. Super. 227, 229 (App. Div. 2000) (affirming as constitutional a Department of Corrections policy subjecting visitors to searches using ion scans and canine units).